IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| GOLF TRAVEL, LLC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No.: _____ |
| | ) | |
| JOSEPH MULLINS; MULLINS SPORTS | ) | **Jury Trial Demanded** |
| AND ENTERTAINMENT, LLC; JOHN | ) | |
| DOE 1-10; ABC CORP 1-20; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff in the above-styled action and by and through its attorneys alleges as follows:

## PARTIES

1.

Plaintiff was a limited liability company organized and duly existing pursuant to the laws of the State of Ohio and whose principal place of business was Scottsdale, Arizona. The only member of Plaintiff resides in Arizona. Plaintiff was engaged in the interstate business of selling golf vacation packages.

2.

Defendant Joseph Mullins ("Mullins") is an individual who maintains a home in or near Augusta, Georgia but is registered to vote and legally resides at 311 North Pine Street, Bunnell, Flagler County, Florida 32110.

3.

Defendant Mullins entered into contracts and committed tortious acts within the state of Georgia as described herein and may be served by service of the Summons and a photocopy of the Complaint at 311 North Pine Street, Bunnell, Flagler County, Florida 32110 or where he may be found.

4.

Defendant Mullins Sports and Entertainment, LLC ("Mullins Sports"), is a limited liability company organized pursuant to the laws of the state of Georgia, whose registered agent for service of process is Joe Mullins, 300 Applecross Drive, Augusta, Columbia County, Georgia 30907, and which may be served by service of the Summons and a photocopy of the Complaint upon said registered agent at said address. Defendant Mullins is the sole member of Mullins Sports.

5.

John Doe 1-10 are individuals who are associated with the named Defendants, who participated in the tortious conduct as described herein or

received money wrongfully taken from Plaintiff by the tortious conduct of other Defendants, and who may be served after identification by service of Summonses and photocopies of the Complaint where they may be found.

6.

ABC Corp 1-20 are corporate entities who are associated with the named Defendants, who participated in the tortious conduct as described herein or received money wrongfully taken from Plaintiff by the tortious conduct of other Defendants, and who may be served after identification by service of Summonses and photocopies of the Complaint where they may be found.

## JURISDICTION AND VENUE

7.

Plaintiff is a citizen of the state of Arizona.

8.

Defendant Mullins is a citizen of the state of Florida.

9.

Defendant Mullins Sports is a citizen of the state of Florida.

10.

Upon information and belief, none of the John Does are citizens of the state of Arizona.   Upon information and belief, none of the ABC Corps which are

organized as corporations are citizens of the state of Arizona.  Upon information and belief, none of the members of the ABC Corps which are organized as limited liability companies are citizens of the state of Arizona.

11.

There is complete diversity between Plaintiff and all Defendants.

12.

The amount in controversy as stated herein exceeds $75,000.00.

13.

This Court has subject matter jurisdiction with respect to this matter pursuant to 28 U.S.C. §1332 (diversity of citizenship).

14.

As shown below, Defendants regularly transact business within the state of Georgia and committed tortious injury in the state of Georgia.  Specifically, Defendants defrauded Plaintiff in Georgia, violated Georgia RICO laws within the state of Georgia causing damages to Plaintiff, and breached contracts to be performed in the state of Georgia subjecting the Defendants to the jurisdiction and venue of this Court in Georgia pursuant to O.C.G.A. §9-10-90 *et seq*.

15.

Venue of this action is proper in the Augusta Division of the Southern District Court of Georgia pursuant to 28 U.S.C. §1391(b)(1) and (2) and O.C.G.A. §9-10-93.

**FACTS**

16.

Plaintiff was a limited liability company organized in 2014 by the owner of a corporation known as SGH, Inc.  For almost forty (40) years, SGH, Inc. operated a profitable business organizing and selling "golf tours" and "golf tournament packages" to the public.  Golf tournament packages included, among other things, providing tickets or badges permitting attendance at professional golf tournaments, housing, and other amenities (the "Business").  In or about 2015, SGH, Inc. started spinning off its "golf tournament package operation" with respect to The Masters to Plaintiff.

17.

During the time when SGH, Inc. operated the Business, one of the golf tournament packages offered and sold involved the golf tournament known as The Masters in Augusta, Georgia ("The Masters").  After transfer of the Masters Tournament package Business to Plaintiff, Plaintiff continued to offer to its

customers golf vacation packages to The Masters.

18.

The crucial elements of The Masters golf vacation packages offered to Plaintiff's customers were the tickets and/or four-day badges ("Badges") permitting attendance to the tournament.

19.

Plaintiff obtained tickets, Badges, and other items from various persons and companies, including Defendants, and included those tickets, Badges, and other things in the golf vacation packages for The Masters that Plaintiff sold to its customers.

20.

SGH, Inc. obtained tickets and Badges for The Masters from Defendants in 2013, 2014, 2015, 2016, and 2017.  During the transfer of the business from SGH, Inc. to Plaintiff and afterwards, Plaintiff obtained or contracted to obtain tickets, Badges, and other things from Defendants for The Masters for the following years: 2015, 2016, 2017, 2018, and 2019.

21.

Except for the years 2018 and 2019, Defendants performed its obligations to provide tickets, Badges, and other items to Plaintiff as the Defendants did in prior

years to SGH, Inc.

### Facts related to the 2018 Masters

22.

On or about April 25, 2017, Defendant Mullins represented to Plaintiff that he had access to and could legally sell tickets to the practice rounds of the 2018 Masters as well as daily tickets and four-day Badges to the 2018 Masters tournament.

23.

Subsequently, Plaintiff negotiated with Defendant Mullins and entered into a contract with Defendant Mullins Sports for the purchase of 183 practice round tickets (Monday, April 2, 2018; Tuesday, April 3, 2018; and Wednesday, April 4, 2018) and ninety-five (95) four-day Badges for the 2018 Masters (Thursday, April 5, 2018; Friday, April 6, 2018; Saturday, April 7, 2018; and Sunday, April 8, 2018). Defendants emailed to Plaintiff the invoice for the tickets and Badges.

24.

Plaintiff paid Defendant Mullins a total of $606,150.00 for the tickets and Badges for the 2018 Masters (practice round tickets: $157,900.00 and Badges: $448,250.00).

25.

Plaintiff received all the practice round tickets it purchased from Defendant
Mullins Sports for the 2018 Masters Tournament.

26.

Defendants failed to provide the 95, *valid*, four-day Badges for the 2018
Masters which Plaintiff purchased from Defendant Mullins Sports for $448,250.00.

27.

Prior to the start of the 2018 Masters Tournament, Defendant Mullins
provided to Plaintiff 95 four-day Badges for the tournament. Pursuant to the
contract between Plaintiff and its customers, Plaintiff distributed these Badges to
its customers prior to the start of the 2018 Masters tournament.

28.

On Thursday, April 5, 2018, the first day of the 2018 Masters Tournament,
four customers of Plaintiff attempted to use four of the Badges Plaintiff received
from Defendants.  When these four clients presented the Badges which Plaintiff
had obtained from Defendants, the clients were stopped at the gate by Masters'
officials and security guards.  These customers were told that their Badges had
been "flagged" as invalid badges.  After the customers were removed to a security
area and interrogated by Masters' security, the Badges were confiscated, the

customers were refused entrance to Augusta National, and they were escorted off the premises by Masters' security.

29.

Over an approximate two-hour period on April 5, 2018, a total of twenty-three (23) customers of Plaintiff were stopped at the gate of Augusta National after presenting their Badges.  All were subjected to interrogation by Augusta National security, were refused entry into Augusta National, had their Badges confiscated, and were escorted off the premises by Masters' security.

30.

Having been confronted and interrogated by Augusta National security, having had their Badges confiscated, having been denied entry to the tournament, and having been escorted off the property by security guards, the customers of Plaintiff were rightly frustrated and angry at Plaintiff.

31.

Of the twenty-three customers of Plaintiff who were interrogated, excluded from the tournament, and escorted off the property, nineteen of them had Badges that Plaintiff had purchased from Defendants.  The four other customers who were interrogated, excluded from the tournament, and escorted off the property, had Badges which Plaintiff had purchased from someone other than Defendants (the

"Non-Mullins Badges").  The Augusta National security confiscated the Badges of these four customers because they were being used by people accompanying people with invalid Badges that Plaintiff purchased from Defendants.

32.

In addition to the four Non-Mullins Badges mentioned in the previous paragraph, eighteen more Non-Mullins Badges were confiscated from Plaintiff's customers by Augusta National security over the four days of the 2018 Masters because those customers were attending the tournament with persons using invalid Badges Plaintiff had purchased from Defendants.  These twenty-two customers with the Non-Mullins Badges were stopped, interrogated, had their Badges confiscated, were refused entrance the premises, and were escorted off the property.

33.

Each of Plaintiff's affected customers reported to Plaintiff that the moment the customer's Badge was scanned, security approached them and asked them to go into the security office.  Each of Plaintiff's affected customers was then interrogated by security guards with respect to where the customer had obtained the Badge before being escorted off the premises.

34.

Upon learning that on Thursday, April 5, 2018, twenty-three of Plaintiff's customers had been stopped, interrogated, refused access to the tournament, and escorted off the premises and that twenty-three four-day Badges to be used by Plaintiff's customers had been confiscated, Plaintiff confronted Defendant Mullins.

35.

In response to Plaintiff, Defendant Mullins offered no explanation for the invalid Badges except to represent that security was more intense that year and the Plaintiff's customers must have gotten unlucky with random secondary inspections.

36.

At the time, Plaintiff had no way to determine if Defendant Mullins' statements were true or false. Plaintiff later learned that the statements made by Defendant Mullins were false, Defendant Mullins knew that they were false when made, and that Defendant Mullins intended to deceive Plaintiff by these false statements.

37.

Inasmuch as a Badge permits entry into the tournament for all four days, the confiscation by Augusta National of the twenty-three four-day Badges on

Thursday April 5, 2018, affected Plaintiff's customers for the next three days of the tournament as well. Thus, twenty-three of Plaintiff's customers did not have the ability to attend any of the four-day tournament resulting in a total of 92 lost tournament days (23 confiscated four-day Badges for four days).

38.

To mitigate Plaintiff's damages, Plaintiff attempted to procure additional Badges or daily tickets for its customers so that Plaintiff's customers could attend the final three days of the 2018 Masters Tournament. Plaintiff also wanted to make sure that its customers in the coming days would not be affected by the confiscation of the Badges, but this placed an enormous logistical and financial burden on Plaintiff.

39.

As part of its business, Plaintiff maintained a database of the Badge or ticket numbers it purchased from various suppliers. Using this information and in an effort to identify the basis of Augusta National confiscating the twenty-three Badges, Plaintiff asked Defendants to look at the numbers of the Badges which had been confiscated and let Plaintiff know if any other Badges sold to Plaintiff by Defendants were in any way associated with the confiscated Badges.

40.

In further efforts to mitigate the damages, Plaintiff believed that if any of the confiscated Badges purchased from Defendants somehow tainted the other Badges purchased from Mullins that had not been confiscated, Plaintiff could not permit its customers to use those Badges on other days and risk the Plaintiff's being confronted by Augusta National security again, interrogated, refused entry, escorted off the premises by Security, and humiliated.

41.

Despite Plaintiff's efforts to identify and not use Badges purchased from Defendants which may have been somehow associated with the confiscated Badges and Defendants' assurances that the Badges were not tainted, on Friday, April 6, 2018, twenty more customers of the Plaintiff were stopped by security of Augusta National, interrogated, excluded from the tournament, and escorted from the property.  Augusta National security also confiscated the twenty Badges.

42.

By Friday, April 6, 2018, forty-three (43) of the Plaintiff's Badges were confiscated by Augusta National.  Of these, 31 were purchased from Defendants and 12 had been obtained from other vendors but were used by people accompanying customers who used Mullins Badges.

13

43.

Some of the Badges obtained by the Plaintiff from Defendants were "sister Badges" meaning that a Badge is associated with one or more other Badges usually owned by the same person.   Some of the Badges obtained by Plaintiff from Defendants were part of a sister Badge group.  Augusta National security stopped some of Plaintiff's customers using "sister Badges" supplied by Defendants, interrogated those customers, barred them from the tournament, and escorted them off the property.  Augusta National canceled all the "sister Badges" in the series and confiscated the sister Badges Plaintiff had purchased from Defendants.

44.

In one incident on Saturday, a group of ten of the Plaintiff's customers who were traveling together to the 2018 Masters were all refused entry when two of the customers presented Badges Plaintiff had purchased from Defendants.  Defendants had provided these two Badges on Thursday night, but they had been voided by Augusta National for reasons that Plaintiff did not know and Defendants did not disclose.

45.

Each four-day Badge can be seen as four tickets (one per day) permitting the holder to attend four days of the tournament.  Because of the confiscation of the 57

four-day Badges (23 on Thursday; 20 on Friday; 10 on Saturday; and 4 on Sunday), Plaintiff lost a total of 176 days of access to the 2018 Masters.

46.

After the confiscation of the Badges that Plaintiff had purchased from Defendants and confiscation of Badges Plaintiff had purchased from other vendors because they were used by customers accompanying customers using Badges purchased from Defendants, Plaintiff sought to mitigate its damages by attempting to locate and obtain tickets and Badges from other vendors.  Plaintiff also refunded money paid to the Plaintiff by some of its customers when Plaintiff could not acquire replacement tickets or Badges.  Specifically, Plaintiff paid $200,400.00 to obtain tickets and a few Badges to replace the confiscated Badges.  Plaintiff also refunded $103,032.00 to customers who could not attend the 2018 Masters because of the void Badges obtained from Defendants which were confiscated by the Augusta National security.

47.

Had Defendants provided valid four-day Badges, the golf vacation packages sold by Plaintiff to is customers would have been profitable, as it had been in the past.

15

48.

A total of 22 four-day Badges which Plaintiff did not purchase from the Defendants had been confiscated by Augusta National security.  It is Plaintiff's understanding that the Non-Mullins Badges were confiscated by the Augusta National security because they were presented by people attending the tournament with people who had presented void Badges purchased by Plaintiff from Defendants.

49.

Augusta National's cancellation of the Badges which Plaintiff obtained from Defendants and the Badges Plaintiff obtained from other sources caused damage to Plaintiff's reputation and forever precluded Plaintiff from obtaining Badges from some sources.  Specifically, for almost four decades Plaintiff and SGH, Inc. had obtained badges and tickets for golf tournaments from a large supplier of tickets and badges.  Because of the fiasco caused by Defendants' sale to Plaintiff of void Badges for the 2018 Masters, this large supplier ended its relationship with Plaintiff and refused to offer Plaintiff badges and tickets for any future tournament.

50.

As a direct result of the failure of Defendants to provide valid Badges or to provide valid substitute tickets or Badges after Augusta National confiscated 57

four-day Badges (35 of which were provided by Defendants and 22 provided by other vendors which were confiscated because they were presented with the void Mullins Badges), Plaintiff lost three long-time corporate accounts and all future revenues associated with those accounts.

51.

During the 2018 Masters and thereafter, Defendants continued to represent to Plaintiff that the Badges were not void or tainted but that they were confiscated by Augusta National security in a random security check. Moreover, Defendants continued to insist that Plaintiff's customers were just unlucky.

52.

Defendant Mullins staunchly denied that he had sold void Badges to Plaintiff and continued to represent that Plaintiff's customers were simply unlucky in a random act of Augusta National's security. At the time, Plaintiff had no way of knowing or proving Defendant Mullins' representations were false.

53.

At the time Defendant Mullins made the representations described in the preceding paragraphs, those representations were false; Defendant Mullins knew that those representations were false, Defendant Mullins made the representations with scienter and the intent to deceive Plaintiff and to induce the Plaintiff to

17

proceed with its business with the Defendants and to refrain from taking immediate legal action against the Defendants; the Plaintiff justifiably relied upon those false representations, and Plaintiff was thereby damaged.

54.

After Plaintiff purchased tickets and Badges from the Defendants for the 2019 Masters but prior to the start of the 2019 Masters Tournament, Plaintiff learned what had occurred with respect to the confiscated Badges for the 2018 Masters tournament that Plaintiff had purchased from Defendants.  Plaintiff also learned that Defendant Mullins was well-aware of what had occurred with respect to the 2018 tickets and Badges before or during the 2018 Masters.  Defendant Mullins failed to disclose to the Plaintiff the truth with respect to the void Badges and continued to maintain his false representations that Plaintiff's customers were just unlucky.

55.

Upon information and belief, a former, disgruntled employee of Defendant Mullins, Defendant Mullins Sports, or one of the other corporate entities owned by Defendant Mullins or someone associated with the former employee, had sent Augusta National a list of Masters' tickets and Badge numbers that Defendant

Mullins Sports had sold to Plaintiff. Augusta National decided to void and confiscate those tickets and Badges.

56.

Defendants never advised Plaintiff that someone had sent the list of tickets and Badges Defendants had purchased for the 2018 Masters.

57.

Defendants knew what Augusta National was likely to do with the information disclosed to it. Defendants had a duty to advise Plaintiff that some of the Badges that Plaintiff had purchased from Defendants had been or could have been voided or otherwise defective, but Defendants failed to so advise the Plaintiff. Defendants' failure to disclose this material fact and Defendants' concealment of this material fact damaged the Plaintiff.

58.

Prior to agreeing to purchase tickets and Badges for the 2019 Masters from the Defendants, Plaintiff was unaware and could not be aware of the truth with respect to the 2018 Masters tickets and Badges that Plaintiff had purchased from Defendants.

**Facts related to the 2019 Masters**

59.

The Masters for 2019 was scheduled for April 11, 2019 through April 14, 2019 with practice rounds April 8, 2019 through April 10, 2019.

60.

Before Plaintiff learned about the true cause of the confiscation of the 2018 Badges which Plaintiff had purchased from Defendants, in or about May 2018, Plaintiff purchased 145 practice round tickets (Monday to Wednesday) and 84 four-day Badges (Thursday through Sunday) for the 2019 Masters from Defendant Mullins Sports. Plaintiff paid Mullins Sports $840,900.00 for the practice round tickets, Badges, and other things for the 2019 Masters.

61.

Although Plaintiff had not learned the reason why Augusta National had confiscated the 2018 Badges from Plaintiff's customers, other vendors had learned of the confiscation, including vendors who offered hospitality buildings used by Plaintiff for the 2018 Masters. Some of these vendors refused to do business with the Plaintiff for the 2019 Masters because of the problems caused by the void Badges Defendants sold to Plaintiff for the 2018 Masters.

62.

In March 2019, Plaintiff traveled to Augusta, Georgia to review the hospitality building Plaintiff had contracted for use at the 2019 Masters Tournament. On that trip, Plaintiff intended to collect from Defendant Mullins the tickets and Badges purchased from Defendant Mullins Sports for the 2019 Masters. Plaintiff returned home a few days later without having met with Defendant Mullins.

63.

During the March 2019 visit, Defendant Mullins refused to meet with Plaintiff or give Plaintiff the tickets and Badges for the 2019 Masters, claiming that he had been called away to Florida. At that time, Defendant did not have the tickets and Badges that Defendants had sold to Plaintiff. Defendant Mullins' representation that "he had been called away to Florida" was false, Defendant Mullins knew that it was false when said, the statement was made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate legal action against Defendants), and Plaintiff justifiably relied on the representations, thereby causing damages to Plaintiff.

21

64.

On March 28, 2019, Defendant Mullins contacted Plaintiff via phone and advised Plaintiff that one of Defendant Mullins' sources of Badges, an employee at Augusta National, had his tickets confiscated. Defendant Mullins assured Plaintiff, however, that although this source was no longer available, Defendants would provide Plaintiff with the 145 practice round tickets, 84 four-day Badges, and other items for which Defendants had been paid. This representation was false, Defendant Mullins knew that it was false when said, the statement was made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate legal action against Defendants), and Plaintiff justifiably relied on the representation, thereby causing damages to Plaintiff.

65.

On or about April 2, 2019, when Plaintiff's president traveled to Augusta to the 2019 Master tournament, six days before the practice rounds were scheduled to begin, Defendant Mullins told Plaintiff that Augusta National had confiscated 75 strips of practice round tickets and 75 Badges from the employee mentioned in the preceding paragraph but, again, assured Plaintiff that this would not prevent Defendants from providing the Plaintiff with the tickets, four-day Badges, and other items for the 2019 Masters that the Plaintiff had purchased from Defendants.

This representation was false, Defendant Mullins knew that it was false when said, the statement was made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate legal action against Defendants), and Plaintiff justifiably relied on the representation, thereby causing damages to Plaintiff.

66.

On or about April 3, 2019, five days before the practice rounds of the 2019 Masters were to begin, Defendant Mullins advised Plaintiff for the first time that Defendants would be unable to provide between 25 and 30 of the Badges the Plaintiff had purchased (and paid for) from Defendants.

67.

On April 4, 2019, four days before the practice rounds for the 2019 Masters were scheduled to begin, Defendant Mullins sent a text message to Plaintiff asking for a meeting in Augusta, Georgia.  Plaintiff's president attended the meeting.  At that meeting, Defendant Mullins told Plaintiff for the first time that Defendants were not going to provide any of the 2019 Masters tickets, Badges, or other items for which the Plaintiff had prepaid.

68.

At the April 4, 2019, meeting, Defendant Mullins assured Plaintiff that he

would refund all the money paid by Plaintiff for the purchase of the tickets, Badges, and other items for the 2019 Masters and would assist Plaintiff in obtaining replacement tickets and Badges for the 2019 Masters.

69.

At the April 4, 2019, meeting, Defendant Mullins had no intention of refunding Plaintiff the entire purchase price for the tickets and Badges for the 2019 Masters nor did Defendant Mullins intend to assist in replacing all the tickets and Badges. Defendant Mullins' representations were false, Defendant Mullins knew that they were false when said, the statements were made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate legal action against Defendants), and Plaintiff justifiably relied on the representations, thereby causing damages to Plaintiff.

70.

Plaintiff attempted to locate and purchase replacement tickets and Badges for the 2019 Masters but Plaintiff encountered problems obtaining replacement tickets and Badges because: (a) other ticket and Badge sources did not have sufficient tickets and Badges; (b) if other sources had tickets or Badges, the tickets and Badges were offered at a much higher price than Plaintiff paid Defendants, and (c) Defendants refused at that time to refund any of the money paid by Plaintiff to

Defendants.

71.

In order to deceive Plaintiff and prevent Plaintiff from taking immediate legal action against Defendant Mullins, Defendant Mullins represented to Plaintiff that he spent 12 hours on April 4, 2019, attempting to locate replacement tickets and Badges for Plaintiff's customers. Defendant Mullins did not intend to locate replacement tickets and Badges and did not deliver replacement tickets and Badges to Plaintiff for all the tickets and Badges Plaintiff had purchased. Defendant Mullins' representations were false, Defendant Mullins knew that they were false when said because he had no intention of attempting to locate replacement tickets and Badges, the statements were made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate legal action against Defendants), and Plaintiff justifiably relied on the representations, thereby causing damages to Plaintiff.

72.

In an effort to protect its customers and save some of its business reputation, because Defendants refused to provide to Plaintiff the 2019 Masters tickets and Badges purchased by Plaintiff from Defendants or provide replacement tickets or Badges, Plaintiff contacted its customers and cancelled the Monday practice

rounds for the customers who had purchased golf vacation packages with practice rounds tickets.

73.

Defendants failed to deliver tickets or Badges and refused to refund the entirety of Plaintiff's money, so Plaintiff's customers had no tickets or Badges for the 2019 Masters.  In order to prevent its customers from traveling to Augusta without the ability to attend the Masters, Plaintiff sent emails to its customers to notify them that there were no tickets or Badges for the 2019 Masters.  To the extent that it could, Plaintiff also used its own funds to send refunds to its customers.  Plaintiff also made follow-up phone calls to explain to its customers that Plaintiff had no tickets or Badges for the 2019 Masters for them.

74.

Plaintiff's notifications as aforesaid to its customers who had already purchased golf vacation packages and already made plans to travel to Augusta were not well received by the customers.  Many of them had already booked flights, some international flights, arranged other transportation to Augusta, and booked hotels and other accommodations, all of which had to be cancelled at the last minute.

75.

From its own resources, Plaintiff refunded approximately $700,000.00 to its customers for the cancelled golf packages for the 2019 Masters.

76.

Ultimately during the week of the 2019 Masters, Defendant Mullins delivered only 22 Monday practice round tickets, 17 Tuesday practice round tickets, zero Wednesday tickets, 31 one-day Thursday tickets, 21 one-day Friday tickets, 20 one-day Saturday tickets, and 20 one-day Sunday tickets.

**Post 2019 Masters Facts**

77.

Plaintiff itself and Plaintiff's predecessor, SGH, Inc., had been offering golf vacation packages to the Masters for almost forty years and were well regarded in the industry. Yet, after the confiscation of Badges in 2018 and the failure to deliver tickets and Badges in 2019, Plaintiff's reputation was destroyed by Defendants' misrepresentations and last-minute refusal to deliver the tickets, Badges, and other things for the 2019 Masters. Furthermore, because Defendants refused to refund all the money Plaintiff paid the Defendants for the tickets and Badges, Plaintiff had to use all of its reserve funds to issue refunds for money some of its customers had paid for the 2019 Masters packages. Of the $840,900.00

27

Plaintiff paid Defendants, Defendants only refunded $288,800.00 during the 2019 Masters which the Plaintiff then paid to its customers.

78.

As a direct result of the destruction of the Plaintiff's reputation as well as the financial instability caused by the wrongful actions of the Defendants, Plaintiff ceased operating and closed.

79.

After the 2019 Masters debacle caused by Defendants' wrongful conduct and after the destruction of the Plaintiff as a going concern, and in an effort to prevent or delay Plaintiff from seeking legal remedies, Defendants promised to refund all the money Plaintiff had paid Defendants for the 2019 Masters tickets and Badges.

80.

Defendant Mullins' representation that he would refund all the Plaintiff's money for the 2019 Masters tickets and Badges was false when made, Defendant Mullins knew that it was false when said because he had no intention of refunding all of Plaintiff's money; the statement was made with scienter and with the intent to deceive Plaintiff and to induce Plaintiff to refrain from acting (taking immediate

28

legal action against Defendants), and Plaintiff justifiably relied on the representation, thereby causing damages to Plaintiff.

81.

In further effort by Defendants to prevent or delay Plaintiff from seeking legal remedies, on May 5, 2019, Plaintiff received an email from Jeff Mullins, believed to be Defendant Mullins' cousin and accountant, advising Plaintiff that he was mailing five checks to Plaintiff for the balance of what Defendants owed Plaintiff.   Jeff Mullins told Plaintiff, however, that these checks could not be deposited into Plaintiff's account at that time because Defendant Mullins Sports did not have the funds to cover the checks.   Jeff Mullins further advised that sending these checks was a gesture of "good faith" and that Plaintiff could deposit the checks when advised by Defendants that funds were available.   At all times relevant, Jeff Mullins was acting as the agent of and at the instructions of the Defendants.

82.

Upon information and belief, Defendants had funds to return all the funds paid by Plaintiff to Defendants for the 2019 Masters tickets and Badges and Defendants' representation to the contrary was false.   The offer of the five checks

was simply another ruse to prevent or delay Plaintiff from proceeding with legal action.

83.

Plaintiff received the five checks, but contrary to the representation by Jeff Mullins, the checks did not equal the amount Defendants owed Plaintiff or the amount Defendants promised to refund to Plaintiff.

84.

Defendants ultimately refunded some of the money Defendants owed Plaintiff including the following:

a.    7/16/2019 - Plaintiff deposited one of the checks provided by Jeff Mullins in the amount of $75.000.00 after notice that it would clear.

b.    7/17/2019 – Plaintiff deposited two other checks provided by Jeff Mullins totaling $107,300.00 after notice that they would clear.

c.    8/19/2020 – Plaintiff deposited Defendants' check in the amount of $28,150.00 per instructions from Joe Mullins, however, that check bounced.

d.    8/24/2020 – Plaintiff received a wire transfer from Joe Mullins in the amount of $84,500.00 to cover the bounced check as well as additional checks not yet deposited.

85.

As of the date of the filing of this lawsuit, Defendants are indebted to Plaintiff for tickets, Badges and other items not delivered for the 2018 Masters and additional costs and expenses in an amount to be proven at trial, but not less than $114,094.00, as well as other damages, including interest, lost profits, and the destruction of Plaintiff as a going business.

86.

Plaintiff would have had profits of approximately $506,461.00 from the 2018 Masters tournament, however, as a direct result of Defendants' wrongful conduct, Plaintiff's profit dropped to only approximately $121,621.00. Therefore, as a direct result of the Defendants' misconduct, Plaintiff suffered damages of at least $384,840.00.

87.

Plaintiff would have had profits of approximately $302,182.00 from the 2019 Masters tournament, however, as a direct result of Defendants wrongful conduct, Plaintiff had a loss of approximately $124,597.00. Therefore, as a direct result of the Defendants' misconduct, Plaintiff suffered damages in 2019 of at least $430,281.00.

88.

The amount Plaintiff ultimately received from Defendants failed to recover Plaintiff's destroyed reputation and failed to restore the Plaintiff to its position as a profitable business.  Defendants are liable to Plaintiff for lost future profits in amounts to be proven at trial but not less than $1,500,000.00.

89.

Through the interrelated wrongful acts of Defendant Mullins, Defendant Mullins Sports, and the John Doe Defendants as aforesaid, the Defendants derived proceeds, i.e., Plaintiff's money.

## COUNT I

### (Common Law Fraud)

90.

Plaintiff restates the allegations contained in paragraphs 1 through 89 herein as if fully restated in full in this paragraph.

91.

At all times relevant, Defendant Mullins acted as an agent of Defendant Mullins Sports as well as the John Doe individual and corporate Defendants. Defendants conspired together to defraud Plaintiff and acted as the agents of one another with the full knowledge and approval of the other Defendants.  The actions

of Defendant Mullins are imputed to the Defendant Mullins Sports rendering Defendant Mullins Sports liable to Plaintiff in like manner.

92.

The representations made by Defendants as more particularly described herein were false; Defendants knew that the representations were false at the time; if they involved future conduct, Defendants had no intent to so act; the representations were made with scienter and the intent to induce Plaintiff to act (pay money) or refrain from acting (taking immediate legal action), and Plaintiff justifiably relied on the representations, thereby causing damages to Plaintiff.

93.

Defendants have been stubbornly litigious, have acted in bad faith, and have caused Plaintiff unnecessary trouble and expense so as to permit Plaintiff to recover its expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. §13-6-11.

94.

Defendants' conduct evinces an intent to harm, or conduct that is reckless, showed willful misconduct, malice, wantonness, oppression, an entire want of care, and conscious indifference to the consequences of that conduct.

95.

Because Defendants' conduct was willful and showed malice, wantonness, oppression or an entire want of care which would raise the presumption of conscious indifference to consequences, Plaintiff is entitled to an award of punitive damages against the Defendants to punish, penalize, or deter said Defendants from such conduct pursuant to O.C.G.A. §51-12-5.1.   Further, Defendants' wrongful acts were made with the specific intent to harm Plaintiff permitting a jury to award punitive damages in excess of the $250,000.00 cap pursuant to O.C.G.A. §51-12-5.1(f).

96.

With respect to this Count, Defendants are liable to the Plaintiff for special damages in amounts shown at trial including but not limited to the extra cost of replacement tickets and Badges for the 2018 and 2019 Masters in amounts to be shown at trial; general and compensatory damages including but not limited to, $114,094.00 for undelivered tickets and Badges, Plaintiff's lost profits in amounts to be proven at trial but at least $815,121.00; consequential damages including the value of Plaintiff as a going concern in an amount to be shown at trial but at least $1,500,000.00; punitive damages in an amount set by the enlightened conscience

of the jury but uncapped pursuant to O.C.G.A. §51-12-5.1(f); and attorneys' fees and costs pursuant to O.C.G.A. 13-6-11.

## COUNT II

### (Racketeering Influenced and Corrupt Organizations Act (O.C.G.A. §16-14-1 *et seq*.)

97.

Plaintiff restates the allegations contained in paragraphs 1 through 96 herein as if fully restated in full in this paragraph.

98.

Defendants have engaged in a pattern of racketeering activity in violation of O.C.G.A. §16-14-4, as alleged herein.

99.

With respect to the 2018 Masters and the 2019 Masters, as aforesaid, Defendants engaged in at least two predicate acts of racketeering activity, namely wire fraud (18 U.S.C. §1343); mail fraud (18 U.S.C. §1341); and theft by deception (O.C.G.A. §16-8-3); each of which are defined as "racketeering activity" under O.C.G.A. §16-14-3(5)(A).

100.

As aforesaid, Defendants made representations to Plaintiff in person, by telephone, via text communications, and by U.S. Mail creating and confirming

Plaintiff's impression that Defendants had the ability to properly and legally obtain tickets and Badges for the 2018 and 2019 Masters tournaments and then transfer those tickets and Badges to Plaintiff.   At the time Defendants made these representations, Defendants knew that they were false and were made to induce Plaintiff to pay money to Defendants.

101.

Defendants acted through the above-mentioned deceitful means and artful practices with the intention of depriving Plaintiff of its property, i.e., its money.

102.

Defendants obtained Plaintiff's property, i.e., its money in violation of O.C.G.A. §16-8-3.

103.

O.C.G.A. §16-8-3(a) states that "[a] person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property."   Further, O.C.G.A. §16-8-3(b) states: "A person deceives if he intentionally:

(1) Creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false;

36

(2) Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed;

(3) Prevents another from acquiring information pertinent to the disposition of the property involved;

(4) Sells or otherwise transfers or encumbers property intentionally failing to disclose an adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not a matter of official record; or

(5) Promises performance of services which he does not intend to perform or knows will not be performed."

104.

The Defendants: (1) created or confirmed Plaintiff's impression of an existing fact or past event which was false, (2) did so with the knowledge and belief that the impression was false, thereby creating the impression with intent to deceive, and (3) deceived and induced Plaintiff to part with its property or become deprived of such property, i.e., money.

105.

Defendants represented to Plaintiff that Defendants had the ability to deliver Masters' Badges for both the 2018 Masters and the 2019 Masters creating a false impression of an existing fact and is in violation of O.C.G.A. §16-8-3.

106.

Defendants intended to deprive Plaintiff of its property permanently. The Defendants knew or believed that the created impression was false, and thereby had the intent to act deceptively.

107.

Defendant Mullins knew he and the other Defendants had no ability or intention to deliver all the Masters tickets Badges promised to Plaintiff and when he made such a representation to Plaintiff, Defendant Mullins knew it created a false impression and was created with intent to deceive the Plaintiff.

108.

A similar conspiracy had been used against at least one other person by Defendant Mullins and one or more of the other Defendants.

109.

In effect, Defendants obtained property, i.e., money, by deceitful means or artful practice with the intention of depriving Plaintiff thereof. As a result of the false impressions created by Defendants, Plaintiff was deceived into believing that Defendants could deliver all the Masters tickets and Badges as promised.

110.

In addition to Defendants' violation of theft by deception under O.C.G.A. §16-8-3(b)(1), Defendants committed theft by deception in violation of O.C.G.A. §16-8-3(b)(2) by failing to correct the false impression of an existing fact or past event which they had previously created or confirmed, constituting an additional predicate act under O.C.G.A. §16-14-3(5)(A).  Defendant Mullins and the other Defendants created a false impression of an existing fact or past event that it knew or believed to be false, and thereafter Defendants failed to correct that false impression.

111.

Defendants also committed an additional predicate act of theft by deception by violating O.C.G.A. §16-8-3(b)(5) by promising to perform services, e.g., obtaining tickets and Badges to replace all the Badges confiscated in 2018 and all tickets and Badges not delivered in 2019 constituting an additional predicate act under O.C.G.A. §16-14-3(5)(A).

112.

Defendants violated 18 U.S.C. §1343, wire fraud, on more than two occasions as aforesaid by using a scheme or artifice for obtaining the Plaintiff's money by means of false or fraudulent representations transmitted by means of

wire (via the telephone and text messages), constituting an additional predicate act under O.C.G.A. §16-14-3(5)(A).

113.

Defendants violated 18 U.S.C. §1341, mail fraud, on more than two occasions as aforesaid by using a scheme or artifice for obtaining the Plaintiff's money by means of false or fraudulent representations transmitted by Defendants or Defendants' agents through the United States Postal Service, constituting an additional predicate act under O.C.G.A. §16-14-3(5)(A).

114.

The wrongful acts of Defendants as aforesaid constitute a pattern of racketeering activity in violation of O.C.G.A. §16-14-4.

115.

In addition to the unlawful acts by the Defendants with respect to Plaintiff, upon information and belief, these same Defendants committed similar acts with respect to at least one other victim where Defendants received the victim's money by falsely representing that the Defendants could secure and transfer Masters' Badges knowing that they could not.

116.

These racketeering activities of the Defendants, as alleged, directly harmed the Plaintiff, were related and have continuity, and were in furtherance of the scheme to defraud Plaintiff, depriving the Plaintiff of its property, i.e., money.

117.

Each of the Defendants received benefits from each alleged racketeering activity conducted by the Defendants.

118.

The Defendants, acting individually and on behalf of each other, through a pattern of racketeering activity or proceeds derived therefrom, did, as further outlined herein, acquire or maintain, directly or indirectly, an interest in or control of Plaintiff's money, thereby causing harm to the Plaintiff.

119.

The Defendants, acting individually and on behalf of each other, did directly and proximately cause the Plaintiff to suffer monetary damages.

120.

Defendants did conspire together and endeavor to violate, as further outlined herein, the provisions of O.C.G.A. §§16-14-4(a) and (b), thus violating O.C.G.A.

§16-14-4(c).  In addition to the aforementioned facts, the corporate Defendants did recklessly tolerate and direct the actions of their agents, the individual Defendants.

121.

The actions and conduct of these Defendants as alleged herein were willful, fraudulent, exhibited bad faith, and evinced an entire want of care which would raise the presumption of a conscious indifference to the consequences to the members of the general public, and in particular to the Plaintiffs, who could reasonably be expected to be affected by said actions and conduct.  As such, pursuant to O.C.G.A. §16-14-6(c) and/or O.C.G.A. §51-12-5.1, Plaintiffs are entitled to recover punitive and special damages from said Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of the jury, in order to punish said Defendants for past misconduct and to deter said Defendants from engaging in similar conduct in the future.

122.

With respect to this Count, Defendants are liable to the Plaintiff for special damages in amounts shown at trial including but not limited to the extra cost of replacement tickets and Badges for the 2018 and 2019 Masters in amounts to be shown at trial; general and compensatory damages including but not limited to $114,094.00 for undelivered tickets and Badges, Plaintiff's lost profits in amounts

Case 1:21-cv-00063-JRH-BKE    Document 1    Filed 04/09/21    Page 43 of 49

to be proven at trial but at least $815,121.00; and consequential damages including the value of Plaintiff as a going concern in an amount to be shown at trial but at least $1,500,000.00.

123.

Defendants are also liable to Plaintiffs for three times Plaintiff's actual damages, punitive damages set by the enlightened conscience of the jury, and Plaintiff's attorneys' fees and costs reasonably incurred pursuant to O.C.G.A. §16-14-6(c) and/or O.C.G.A. §13-6-11.

## COUNT III
### (Breach of Contract and Alter Ego)

124.

In the alternative, Plaintiff asserts this Court for Breach of Contract as follows:

125.

Plaintiff incorporates the allegations contained in paragraphs 1 through 89 by reference.

126.

Defendant Mullins is the owner and operator of Defendant Mullins Sports and the other corporate Defendants.

127.

Upon information and belief, Defendant Mullins has ignored the separate existence of Defendant Mullins Sports and the other corporate Defendants by using them as an alter ego, agent, and instrumentality by keeping said corporations under Defendant Mullins' domination and control and by perpetuating its existence only to serve his personal purposes.

128.

By reason of the foregoing, the Court should disregard the separate existence of Defendant Mullins Sports and other corporate Defendants as corporations or companies and hold Defendant Mullins personally liable for all amounts due to Plaintiff from Defendant Mullins Sports and the other corporate entities.

129.

Plaintiff fully performed its obligations under the agreements with Defendants, including the payment of all money owed by Plaintiff to Defendants.

130.

Defendants breached the agreements with respect to the 2018 Masters tickets and Badges and the 2019 Masters tickets and Badges by not providing the tickets and Badges purchased and paid for by Plaintiff.

131.

Defendants' breach of the agreements with respect to the 2018 and 2019 Masters tournaments caused direct damages to the Plaintiff for which the Defendants are liable, including without limitation, the value of the tickets and Badges not provided, in an amount to be proven at trial but in excess of $114,094.00.

132.

As descried in detail below, the Defendants' breach also caused lost profits and consequential damages for which the Defendants are liable pursuant to O.C.G.A. §13-6-2; §13-6-8; §51-12-10; and other Georgia law.

133.

The Defendants knew that Plaintiff intended to include the 2018 and 2019 Masters tickets and Badges to be obtained from Defendants in golf vacation packages that Plaintiff sold to its customers.

134.

The Defendants not only failed to deliver the tickets and Badges purchased and paid for by Plaintiff, but Defendants also refused to immediately refund to Plaintiff the money to Plaintiff thereby forcing Plaintiff to use its reserve funds to

purchase substitute tickets and Badges at a much higher price or to cancel Plaintiff's customers' packages.

135.

Defendants never fully refunded to the Plaintiff all the money Plaintiff paid to Defendants for the 2018 and 2019 Masters tickets and Badges.

136.

As a result of the Defendants' breach of the agreements regarding the 2018 and 2019 Masters tickets and Badges, Plaintiff reimbursed its customers out of Plaintiff's own reserve funds. Plaintiff lost revenues and its reputation as a direct result of Defendants' failure to provide viable tickets and Badges. These wrongful acts of Defendants destroyed Plaintiff as a viable business.

137.

The Plaintiff suffered consequential damages solely caused by the Defendants' breach of the agreements to provide tickets and Badges for the 2018 and 2019 Masters and those damages are capable of exact computation.

138.

The consequential damages suffered by the Plaintiff arising from the Defendants' breach of the agreements as aforesaid arose naturally and according to

the usual course of events from such breach. Defendants and Plaintiff contemplated such consequences when they entered into the agreements.

139.

The Defendants breached the agreements with foreknowledge and for the purpose of depriving the Plaintiff of its contemplated benefit.

140.

At all times and in all matters mentioned above and as aforesaid, Defendants have been stubbornly litigious and have caused Plaintiff unnecessary trouble and expense thereby entitling Plaintiff to an award of reasonable attorneys' fees and court costs pursuant to O.C.G.A. §13-6-11.

141.

With respect to this Count, Defendants are liable to the Plaintiff for special damages in amounts shown at trial including but not limited to the extra cost of replacement tickets and Badges for the 2018 and 2019 Masters in amounts to be shown at trial; general and compensatory damages including but not limited to $114,094.00 for undelivered tickets and Badges, Plaintiff's lost profits in amounts to be proven at trial but at least $815,121.00; consequential damages including the value of Plaintiff as a going concern in an amount to be shown at trial but at least $1,500.00.00; and attorneys' fees pursuant to O.C.G.A. §13-6-11.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

a.      That Summons and a copy of this Compliant for Damages be served on all named Defendants as provided by law;

b.      That Plaintiffs have a trial by jury as to all issues;

c.      That Plaintiffs have and recover compensatory damages against all Defendants in amounts to be proven at the trial of this matter;

d.      That the Plaintiff's damages be trebled as provided in O.C.G.A. §16-14-6;

e.      That the Plaintiffs have and recover punitive damages against the Defendants in an amount set by the enlightened conscience of the jury pursuant to O.C.G.A. §16-14-6(c) and/or O.C.G.A. §51-12-5.1;

f.      That the Plaintiffs have and recover the cost of this litigation including reasonable attorneys' fees pursuant to O.C.G.A. §16-14-6(c) and/or O.C.G.A. §13-6-11 in an amount to be proven at trial; and

g.      That the Plaintiffs have and recover such other and further relief as the Court may deem just and proper.

Respectfully submitted this 9th day of April 2021.

Attorneys for the Plaintiffs

AUSTIN & SPARKS, P.C.

By:    */s/John T. Sparks, Sr.*_____
       John T. Sparks, Sr.
       Georgia State Bar No. 669575
       jsparks@austinsparks.com
       John B. Austin
       Georgia State Bar No. 028814
       jaustin@austinsparks.com

2974 Lookout Place, N.E.
Atlanta, Georgia 30305
404-869-0100 / 404-869-0200 (fax)