IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
GOLF TRAVEL, LLC,            )
                            )
            Plaintiff,      )
                            )CIVIL ACTION NO.:
        vs.                 )1:21-cv-00063-JRH-
                            )BKE
JOSEPH MULLINS; MULLINS     )
SPORTS AND ENTERTAINMENT,   )
LLC; JOHN DOE 1-10; ABC     )
CORP 1-20,                  )
                            )
            Defendants.     )
```

DEPOSITION CONDUCTED VIA VIDEO CONFERENCE

DEPOSITION OF JERRY HOTTLE

November 16, 2022
3:35 p.m.

Zoom Deposition Originating From
Professional Court Reporters LLC
3659 Chattahoochee Summit Drive
Atlanta, Georgia

By Colleen Lee, RPR, CCR-2799

*******************************************************

PROFESSIONAL COURT REPORTERS LLC
3659 Chattahoochee Summit Drive
Atlanta, Georgia  30339
770.952.0604
www.ProfessionalCourtReporters.com

APPEARANCES OF COUNSEL


On behalf of the Plaintiff:

    JOHN T. SPARKS, SR., Esq.
    Austin & Sparks, P.C.
    2974 Lookout Place
    Suite 200
    Atlanta, GA  30305
    404.869.0100
    jsparks@austinparks.com


On behalf of the Defendants:

    RANDOLPH FRAILS, Esq.
    TAMEKA HAYNES, Esq.
    Frails & Wilson
    211 Pleasant Home Road
    Suite A1
    Atlanta, GA  30907
    706.855.6715
    randyfrails@frailswilsonlaw.com
    thaynes@frailswilsonlaw.com



               - - -

INDEX TO EXAMINATIONS

Examination                                          Page

By Mr. Sparks                                          4

By Mr. Frails                                         75

By Mr. Sparks                                         80

- - -

```
 1                (Reporter disclosure made pursuant to

 2            Article 8.B. of the Rules and Regulations of the

 3            Board of Court Reporting of the Judicial Council

 4            of Georgia.)

 5                        JERRY HOTTLE,

 6       having been first duly sworn, was examined and

 7       testified as follows:

 8                MR. SPARKS:  This the deposition of Jerry

 9            Hottle, witness in the case Golf Travel versus

10            Joe Mullins and others.  I suggest we reserve

11            all objections except to the form of the

12            question or responsiveness of the answer.

13                Do you agree, Randy?

14                MR. FRAILS:  I agree.

15                        EXAMINATION

16       BY MR. SPARKS:

17            Q.    Mr. Hottle, during the course of the

18       deposition, I might ask you to speak up.

19            A.    Okay.

20            Q.    I'm not being rude.  The microphone might

21       not pick something up and I have got real bad hearing

22       in one ear, so forgive me for that.

23            A.    Me too.  Because I have hearing aids but I

24       didn't wear them.

25                MR. SPARKS:  This is off the record.
```

```
 1                  (Pause in the proceedings.)
 2                  MR. SPARKS:  Back on the record.
 3        Q.    (By Mr. Sparks) Mr. Hottle, please state
 4   your name for the record.
 5        A.    Jerry W. Hottle.
 6        Q.    What's your current address?
 7        A.    109 Palmer Court, Evans, Georgia.
 8        Q.    Have you ever lived in a place that was
 9   owned by Joe Mullins or any of Joe Mullins'
10   companies?
11        A.    No.
12        Q.    Do you have a cell phone?
13        A.    Yes.
14        Q.    What is your cell phone number?
15        A.    706.829.0289.
16        Q.    How long have you had that number?
17        A.    Oh, 15 to 20 years.
18        Q.    Who is your provider?
19        A.    Straight Talk.
20        Q.    Straight Talk?
21        A.    Yes.
22        Q.    How long have you had that provider?
23        A.    As long as I have had the phone.
24        Q.    You are pointing at something.  I'm sorry?
25        A.    There is something on our phone.
```

```
 1              MR. FRAILS:  We just had a pop-up come up.
 2       He's good.
 3       Q.    (By Mr. Sparks) Have you ever sent texts
 4  using your phone?
 5       A.    Yes.
 6       Q.    Have you ever sent texts to or received
 7  texts from Joe Mullins on your phone?
 8       A.    Yes.
 9       Q.    Do you have copies of those texts?
10       A.    No.
11       Q.    When is the last time you erased those
12  texts?
13       A.    I usually erase them every day unless I
14  need, you know, more conversation on them.
15       Q.    Do you communicate with Joe Mullins by
16  e-mail?
17       A.    Occasionally, yes.
18       Q.    What e-mail do you use to communicate with
19  Joe Mullins?
20       A.    My e-mail address?
21       Q.    Yes.
22       A.    JerryH9937@bellsouth.net.
23       Q.    Have you ever communicated with Joe
24  Mullins using another e-mail?
25       A.    No.
```

1        Q.     Do you have a current e-mail with Hotmail?

2        A.     No.

3        Q.     Have you ever had an e-mail with Hotmail?

4        A.     Not to my knowledge, no.

5        Q.     Is your name Jerry, your formal name, or

6   is it Gerald?

7        A.     It is Gerald.  Jerry is a nickname.

8        Q.     Have you had ever had an e-mail with

9   Yahoo -- Yahoo.com?

10        A.     I don't think so.  Sometimes -- it's AT&T

11   and Yahoo comes up at the same time.  I'm not -- like

12   I tell people, I'm a little technology challenged so

13   I don't know how to answer that.

14        Q.     Have you ever given a deposition before?

15        A.     Oh, one time about 35 years ago, maybe.

16        Q.     In a deposition I might have to ask some

17   questions that seem personal.  I don't mean to, but

18   it's information I need.

19        A.     Okay.

20        Q.     And here is one of them.  Are you taking

21   any medications today?

22        A.     Have I taken any?

23        Q.     Yes.

24        A.     Yes.

25        Q.     Any of them -- what are they for, if you

1    don't mind telling me.

2          A.     Let me think.  Actually, the medications I

3    mostly take in the afternoon and night.  In the

4    morning I usually take -- what I take in the morning

5    is usually some Tylenol and maybe some vitamins of

6    one type or another, but not specifically

7    medications.

8          Q.     Are you taking anything now that would

9    impair your ability to understand my questions or

10   answer them completely or truthfully?

11         A.     Not that I'm aware of, no.

12         Q.     Were you born in Pennsylvania?

13         A.     Yes.

14         Q.     Are you related to anyone in or around

15   Augusta with last names other than Hottle?

16         A.     Other than what?

17         Q.     Your last name.  Is it Hottle or Hottle?

18   How do you pronounce it?

19         A.     Hottle.  Like a bottle only with an H.

20         Q.     Hottle.  Okay.  Do you have any relatives

21   in or around Augusta with last names other than

22   Hottle?

23         A.     In-laws.

24         Q.     What are their last names?

25         A.     Sweat.

```
 1          Q.     Sweat?
 2          A.     Sweat, like perspiration.
 3          Q.     Do you have any children that are over 18
 4  that live in and around Augusta?
 5          A.     Yes.
 6          Q.     How many?
 7          A.     Two.
 8          Q.     Boys or girls?
 9          A.     I have a son, Bruce Hottle.
10          Q.     What is your other child's name?
11          A.     Pamela Mathis.
12          Q.     Do you have any grandchildren that are
13  over 18 that live in or around Augusta?
14          A.     I do.  Let's see, I have Kyle Mathis,
15  Morgan Mathis.  That's all.  That's all.
16          Q.     Any great-grandchildren over 18?
17          A.     No.
18          Q.     Your wife's maiden name is Sweat.  Is she
19  your first wife?
20          A.     No, that's my sister-in-law.
21          Q.     Sister-in-law.  Sorry.
22          A.     My wife is James.
23          Q.     Your wife is Jane?
24          A.     Her maiden name is James, like J-a-m-e-s.
25          Q.     Let me make sure I've got it right.  Your
```

```
 1   wife's maiden name is James?
 2        A.    Correct.
 3        Q.    What is her first name?
 4        A.    Frances.
 5        Q.    Is she your first wife?
 6        A.    Only, 65 years.
 7        Q.    Wow, congratulations.  Did you grow up in
 8   Pennsylvania?
 9        A.    I did.
10        Q.    Where?
11        A.    Bethlehem.
12        Q.    How did you end up in Augusta?
13        A.    Army.
14        Q.    When did you first move to Augusta?
15        A.    '56, in the Army.
16        Q.    When did you get out of the Army?
17        A.    The last day of '58.
18        Q.    And you stayed in Augusta?
19        A.    I did.  I stayed in Augusta.
20        Q.    What did you do for a living from '58 to
21   whenever you retired, if you did.
22        A.    Well, there was some short-term jobs but,
23   basically, I was in finance and banking 40 years,
24   give or take.
25        Q.    What's the last bank you worked for?
```

```
1        A.     Actually, it was Banker's First, but we
2   were purchased by SouthTrust and then Wachovia.
3   There was a period of about three or four merges
4   right before I retired.
5        Q.     Okay.  Did you go to college?
6        A.     No.
7        Q.     Ever file bankruptcy?
8        A.     No.
9        Q.     Have you ever been a party to a lawsuit?
10       A.     Not personally.
11       Q.     Ever been arrested or convicted?
12       A.     No.
13       Q.     Let's talk about this deposition.  What
14   did you do to get ready for today's deposition?
15       A.     I reviewed the past couple of years that I
16   worked for Joe Mullins.
17       Q.     What do you mean reviewed?  What did you
18   look at?
19       A.     Randy shared -- that deposition was with
20   Ian Jack, I guess.
21       Q.     So you looked at Ian Jack's deposition?
22       A.     I don't think I seen the entire
23   deposition, no.
24       Q.     Did you look at pages from the deposition
25   that Mr. Frails pulled out for you?
```

1        A.     Are the pages numbered?

2        Q.     They should be, yes.  Do you have them in

3   front of you?

4        A.     Okay.   Top right-hand corner, I guess, is

5   the page number.

6        Q.     Okay.   How many pages have you got there?

7        A.     Page 89 through page 202.

8        Q.     Were any of the -- keep those in front of

9   you -- on any of the pages information highlighted or

10  marked in any way?

11       A.     Yes.  And I made some notes on the pages,

12  as well.

13       Q.     When you got them, were they marked?

14       A.     No; just highlighted.

15       Q.     Highlighted.  Okay.  So you got 89.  Where

16  is the first highlight in those documents that you've

17  got?

18       A.     A brief one on page 91.

19       Q.     What line?

20       A.     Line 15 through 18.

21       Q.     All right.  Why were those lines

22  highlighted, if you know?

23       A.     Why were they highlighted?

24       Q.     Yes.

25       A.     I don't know.  It didn't concern me

1  necessarily.

2      Q.    Do you know anything about a disgruntled

3  employee that worked for Mullins?

4      A.    Without being factious, there were a lot

5  of disgruntled employees over the years that worked

6  for Mullins.  I don't know if you are talking about

7  anyone specifically; no.

8      Q.    What about 19 -- I'm sorry, 2018, was

9  there a disgruntled employee that worked for him, an

10  employee that got fired that you recall?

11     A.    Not that I know of, no.

12          MR. SPARKS:  Randy, is there any way that

13      he has got those pages e-mailed to me?

14          MR. FRAILS:  Yes.  Just give me a minute

15      and I will forward them to you.

16          MR. SPARKS:  I'm sorry, Randy.  I can't

17      hear you.

18          MR. FRAILS:  Just give me a minute and I

19      will forward them to you.

20          MR. SPARKS:  Okay.

21          (By Mr. Sparks) So we've got page 91 with

22      highlights.  Did you put any notes on them?

23     A.    No.

24     Q.    What is the next that was highlighted?

25     A.    Page 93, line 12 and 13, which was kind of

1   an incomplete sentence.  It didn't make sense what

2   was highlighted.  And then --

3       Q.    Well, let's talk about that highlight.  12

4   and 13, so it is his blank.  I called him his runner

5   Jerry, came up to bring me the practice round tickets

6   and told me.

7            Did you give -- I'm sorry.  Were you a

8   runner for Mr. Mullins in '18?  Is that sort of what

9   you were doing?

10      A.    What is highlighted is Jerry, came up to

11  bring me.  That's the end of the highlight.

12      Q.    Okay.  Let's ask about the whole thing,

13  though.  In 2018 is it fair to say you were being a

14  runner for Joe Mullins, referring to The Masters?

15      A.    Yes.

16      Q.    And then did you take some tickets to Ian

17  Jack in '18?  Some tickets that Joe Mullins had

18  bought, did you take any of those tickets to Ian

19  Jack?

20      A.    Yes.

21      Q.    Did you take practice round tickets to Ian

22  Jack in 2018 that Joe Mullins had bought?

23      A.    I'm certain that I did.

24      Q.    I suppose you spoke with Ian Jack when you

25  took him those tickets, right?

```
 1        A.     I would imagine so.
 2        Q.     When is the first time you ever met Ian
 3   Jack?
 4        A.     That is a tough question.   Probably, I'm
 5   guessing, '15, maybe a little before that.
 6        Q.     And when you met him, was it always
 7   concerning Joe Mullins selling Masters tickets and
 8   badges?
 9        A.     That's correct.
10        Q.     Where is the next place there is a
11   highlight?
12        A.     Line 17 and 18.
13        Q.     And it refers to somebody being "disgusted
14   by it."  What happened in 2018 to The Masters badges
15   that Joe bought?
16        A.     Well, I don't understand the question.
17   That is a broad question.   All of the badges or just
18   the ones concerning Ian?
19        Q.     Some of the badges were flagged by Augusta
20   National and confiscated, right, in 2018?
21        A.     I don't know.   I don't know that you would
22   say flagged.   Some of the badges were confiscated
23   during the course of The Masters as they went -- to
24   the best of my knowledge, as they went through the
25   gate.
```

1      Q.    Okay.  What do you know or what have you

2   heard about that -- about the badges being

3   confiscated?  Specifically, the badges that Joe

4   Mullins sold to Ian Jack.

5      A.    I know when the badges first started

6   getting confiscated at the gate, Ian called us and

7   related to us what was occurring.

8      Q.    All right.  Did Ian call you?

9      A.    I don't recall if he called me or Joe.

10  I'm not certain of that.

11     Q.    You talked with Ian about it at some time,

12  though, didn't you?

13     A.    Yes.

14     Q.    If you recall, what did you tell Ian about

15  those badges that were confiscated in 2018?

16     A.    I don't understand the question.  I didn't

17  tell him anything about that.  Other than I secured

18  those badges.  We sold them to Joe -- I mean, we sold

19  them to Ian and they were being confiscated.

20     Q.    Do you have any idea why they were being

21  confiscated?

22     A.    Because they weren't owned by the person

23  that was presenting them at the gate.

24     Q.    How do you think Augusta National learned

25  that?

1        A.    Well, I couldn't begin to tell you their

2   sophisticated processes.  But they stamp the tickets

3   and they know who -- by the number they know who owns

4   the ticket and they ask the person -- I'm not there

5   so I don't know what the questions are.  But they ask

6   the person, are you so and so and it goes on from

7   there.  The investigation goes on from there between

8   the people at the Masters and the person presenting

9   the ticket.

10       Q.    I am having trouble seeing you.  If you

11  could put the paper down a little bit.  Thank you.

12             Now, isn't it true that a lot of badges

13  are used by the people that don't own them?

14       A.    No, sir.

15       Q.    Would you think that at least half of the

16  badges are used by people that don't own them?  Is

17  that your experience?

18             MR. FRAILS:  Object to the form.  You can

19       answer, Jerry.  I'm objecting to the form of the

20       question, but you can answer.

21             THE WITNESS:  State the question again.

22       Q.    (By Mr. Sparks) I'm just trying to figure

23  out -- you said Augusta National would ask -- would

24  check and see the name on their records and then ask,

25  are you so and so.  And I think you told me that it

1    was quite common for people to use badges that were

2    not sold to them by Augusta National, right?

3          A.    Correct.

4          Q.    A lot of people use badges like that,

5    right?

6          A.    That's true.

7          Q.    I'm trying to figure out, in your

8    experience, about how many people who go to Augusta

9    National were using badges that they didn't buy

10   directly from Augusta National.

11         A.    I have no clue.

12         Q.    Certainly, it is more than 10 percent,

13   isn't it?

14         A.    Oh, yes, I would guess.

15         Q.    Probably more than 50 percent, could be,

16   couldn't it?

17         A.    I don't know.

18         Q.    How many badges, if you heard, did Augusta

19   National confiscate in 2018?

20         A.    I'm not privy to that information.  I

21   don't know how many they confiscated.

22         Q.    Did Augusta National confiscate other

23   people -- badges bought by people other than Joe

24   Mullins?

25         A.    My understanding, they did.

```
 1        Q.     Whose badges got confiscated?

 2        A.     I do not know.  I heard that they did.

 3        Q.     Do you know how many were confiscated?

 4        A.     No.

 5        Q.     How many of Joe Mullins' badges got

 6   confiscated in 2018?

 7        A.     In 2018, there were 28 badges of Ian

 8   Jack's that were confiscated at the gate when they

 9   were scanned, to my knowledge.  And we had an

10   additional 32 badges that were confiscated either at

11   the gate or for some other reason.  I don't know why.

12             Oh, what happened?

13        Q.     You are looking at something.  What do you

14   have?

15        A.     Did you get that?

16             MR. SPARKS:  I didn't get anything.

17             MR. FRAILS:  Did you hear what he said?

18             MR. SPARKS:  I did get that there were 32

19        badges with other people that got confiscated.

20             THE WITNESS:  There was 28 of Ian Jack's

21        badges that were confiscated at the gate.  And

22        we had 32 other badges that were confiscated

23        either at the gate or after the fact.  And we

24        learned about them after the Masters.

25        Q.     (By Mr. Sparks) So that is 60 badges that
```

1    got confiscated?

2         A.    That's correct.

3         Q.    Who got the 32 badges that were

4    confiscated?  These aren't Ian Jack's badges.  Who

5    got the 32 that were confiscated?

6         A.    They were confiscated by other people like

7    Ian Jack.

8         Q.    Who were those other people whose badges

9    got confiscated?  Do you know?

10        A.    They were -- I got that somewhere.  They

11   were people like Ian.  One was Phil -- I don't

12   remember the names of their companies.  One was Phil

13   Sloan.  He's up from Northeast.  One was Total Travel

14   is the name of a company.  Wait, here we go.  Wait a

15   minute.  One was Quint, Q-u-i-n-t.  I don't know the

16   full name of that company.

17        Q.    Okay.

18        A.    And there was an individual by the name of

19   Potter.

20        Q.    Did you ever learn what happened to the 60

21   badges and why they were -- I know they were

22   confiscated, but did you ever learn why they were

23   confiscated?

24        A.    Well, the ones confiscated at the gate

25   were for the reason we already discussed.  And I do

1    not know the entire reason these other 32 were

2    confiscated either at the gate or something that

3    occurred after the entrance into the tournament or

4    after the tournament itself.  I don't know.

5         Q.   Do you know if Augusta National asked

6    everybody that came to the 2018 Masters their name

7    and did they check every badge that came in?

8              MR. FRAILS:  Object to the form of the

9         question.

10             MR. SPARKS:  It is a terrible question.

11        Let me re-ask that.

12        Q.   (By Mr. Sparks) Do you know if Augusta

13   National checked the names associated with each badge

14   presented in 2018?

15        A.   No, I do not know that.

16        Q.   Do you know why 28 of the badges Ian got

17   from Joe Mullins -- that was a terrible question

18   again.

19             Your understanding is that Augusta

20   National asked the owner of the badge or the 28

21   badges Ian got from Joe Mullins, right?  That's your

22   understanding?

23        A.   I don't understand that thoroughly -- that

24   question.

25        Q.   I'm trying to figure out why, if you know,

1   Augusta National confiscated the 28 badges that Ian

2   got from Joe Mullins.  Do you know why?

3        A.    I do not know why, other than what

4   occurred at the gate.

5        Q.    You weren't at the gate, were you?

6        A.    No.

7        Q.    So when you testified that Augusta

8   National would know the name of the person that

9   bought the badge and ask the person who was coming in

10  their name, you don't know if that happened at all

11  concerning these 28 badges, right?

12       A.    They wouldn't have -- in my opinion, they

13  wouldn't have had any other reason to confiscate

14  them.

15       Q.    I'm not asking your opinion.  I'm asking

16  you if you know what happened that caused Augusta

17  National to confiscate these badges?

18       A.    No.

19       Q.    Who was working for Joe Mullins in 2018?

20  Give me some names.

21       A.    I can't remember those names, honestly.

22  Related to The Masters activities?

23       Q.    Yes.  Not names related to his real

24  estate, but people that do anything relating to The

25  Masters in 2018.

1          A.      You're looking at him.

2          Q.      Didn't he have some secretaries working

3    for him?

4          A.      They didn't engage in The Masters

5    activity.

6          Q.      What were their names, though?  Do you

7    know them?

8          A.      I do not know.  I can't remember, let me

9    put it that way.

10          Q.      Do any of them still work for Joe?

11          A.      No.

12          Q.      Let's go further in this deposition.  I

13    got down to -- let's see, what page, to 93.  What is

14    the next highlighted portion?

15          A.      Did I mention 17 and 18?

16          Q.      It says something about that he was

17    disgusted and then told me the story.  Do you recall

18    talking with Ian Jack and being disgusted about

19    anything?

20          A.      No.  And I don't recall discussing a

21    story.

22          Q.      And then it goes on, an employee of Joe's

23    or somebody in the office had left, then fired.  Do

24    you recall anybody being fired in 2018?

25          A.      Not as it relates to The Masters activity,

1    no.

2         Q.    What about related to anything?  Anybody

3    working for Joe that got fired in '18?

4         A.    I wouldn't know that.

5         Q.    Did you work in the office with Joe?

6         A.    I had a role -- 50 percent of my time was

7    at home, worked from the home.  And then I would meet

8    people in Joe's office.  I was not there 100 percent

9    of the time, probably very little.  Only to secure

10   the badges from the people that we were buying them

11   from, our clients to get the badge and pay the people

12   for the badge.  That was my only activity inside

13   Joe's office.

14        Q.    Is it fair to say that you would -- if I

15   understand it, you would know somebody that was going

16   to sell a badge to Joe and Joe would give you the

17   money and you would go get the badge and take it back

18   to Joe?

19        A.    Correct.

20        Q.    Now, did you pay the person in cash

21   usually?

22        A.    Cash and/or check.  It depended upon the

23   person.

24        Q.    Do you know a percentage of the people

25   that got cash versus check?

```
 1          A.     No.
 2          Q.     Had you bought badges from these people in
 3   the past?
 4          A.     Yes.
 5          Q.     Did y'all essentially have a source of
 6   badges that you went back to every year, right?
 7          A.     Correct.
 8          Q.     Did you pick up the cash at Joe's office
 9   or the check at Joe's office?
10          A.     No.
11          Q.     Where would you pick up the cash or check?
12          A.     Go to the bank to get the cash.
13          Q.     How would you get cash out of the bank?
14          A.     Joe would issue a check for cash which I
15   would get and bring back to have the cash available
16   to buy the tickets from the place.
17          Q.     When he gave you a check for cash, was
18   that to buy specific badges or was it to have cash on
19   hand to go buy badges when they became available?
20          A.     More specific badges.  Sometimes there
21   would be a small portion available in the event
22   someone unknown came in that wasn't by appointment.
23   I usually had appointments set up, you know, to
24   prepare for the transaction.
25          Q.     So would you negotiate the price for the
```

 1  badge or would Joe?

 2        A.    No, Joe would.

 3        Q.    And Joe would tell you this person had

 4  four badges to sell at this price, go get them?

 5        A.    Correct.

 6        Q.    You would tell them -- pick up the check,

 7  go to the bank, get the cash, go get the badges, and

 8  return them to Joe?

 9        A.    They would come into the office.

10        Q.    The people would come to the office?

11        A.    Yes.  And bring the badges and we would

12  give them the check or the cash.

13        Q.    Oh, you didn't go out to people's houses

14  and pick up the badges?

15        A.    No.

16        Q.    About how much were these selling

17  for -- about how much was Joe buying the badges for

18  in 2018?  What was the range?

19        A.    The range?

20        Q.    Yes.  They weren't all the same price,

21  were they?

22        A.    The range -- in 2018, the range could have

23  been as low as -- an individual badge could have been

24  as low as 3,500 and it could have gone to a range

25  of -- let's see; 2018, it could have gone to a range

```
 1   of -- that's testing my memory.  I really can't -- so
 2   this is a guess, 5,500 in 2018.
 3        Q.     That is per badge?
 4        A.     Per badge.
 5        Q.     That was paid to the owner?
 6        A.     Pardon?
 7        Q.     That was paid to the owner of the badge?
 8   I'm sorry, I didn't hear your answer.
 9        A.     Yes.
10        Q.     So the range is about 3,500 to 5,500 per
11   badge paid to the owner?
12        A.     Correct.
13        Q.     Did any owner have as many as four badges?
14        A.     Yes.
15        Q.     So if an owner had four badges, you would
16   have to get from $14- to, what, 22,000 to get those
17   four badges, right?
18        A.     If the math is right, correct.
19        Q.     Mine is, too.  And you would go out and
20   you would get a check for cash from Joe, you'd go to
21   the bank and you would get that $14- to 22,000 and
22   bring it back and the person would bring the badges
23   to Joe's office?
24        A.     Correct.
25        Q.     And you'd give that person the 14- to
```

1    22,000, right?

2         A.    Yes.  If cash was the determining factor.

3    We gave checks to some people.

4         Q.    But some people got cash, right?

5         A.    Yes.

6         Q.    And some people got more than 10,000 in

7    cash because they had four badges, right?

8         A.    Right.

9         Q.    When you went to the bank, I presume at

10   times you had checks in excess of $10,000, right?

11        A.    That I had that I --

12        Q.    That Joe gave you a check --

13        A.    Right.

14        Q.    -- in excess of 10,000 bucks because you

15   needed to pay somebody that cash for the badge,

16   right?

17        A.    Right.

18        Q.    Did the bank require you to fill out any

19   paperwork because the cash transaction was more than

20   10,000?

21        A.    I don't recall if they did.

22        Q.    You are a former banker.  Do you know if

23   they should have?

24        A.    I think they should have, but I was never

25   involved in that part of the banking.  I was always

```
 1   in the developing of the programs staff.  The staff
 2   position, if you will.
 3       Q.    Okay.  While you were banking and you
 4   didn't deal with that issue, but you think they
 5   should have filled it out, right?
 6       A.    My understanding is yes.
 7       Q.    Let's go on to the rest of this page.  Any
 8   more of this deposition page 93 that's highlighted?
 9       A.    Nothing other than 21, Joe or somebody in
10   the office -- but I think you already looked at that.
11       Q.    But you don't recall if anybody left,
12   right?
13       A.    No.
14       Q.    Somebody could have left that you didn't
15   know about because you weren't there every day,
16   right?
17       A.    Right.
18       Q.    What is the next part of the deposition
19   that is highlighted?
20       A.    Page 94.
21       Q.    What line?
22       A.    Line 5, 6, 9, 10, 11, 12.
23       Q.    All right.  And this talks about asking
24   about Jerry's last name -- and your last name is
25   spelled all sorts of ways there.  It says that
```

1  somebody turned in Joe's -- the tickets, but you

2  didn't know who did it?

3        A.    No.  It says, Jerry told you that someone

4  turned in a list of Joe's tickets from 2018 that did

5  not because --

6        Q.    You don't recall telling him that?

7        A.    No.  I would not have told him that

8  because there was no list.

9        Q.    Joe didn't have a list of badges?

10       A.    I am the only one that had the list of

11 badges that we secure from our customers that Joe

12 turned around and sold to the suppliers.

13       Q.    So you're saying Joe didn't have a list of

14 those badges?

15       A.    He had access to it through me, but he

16 didn't have it in front of him on a day-to-day basis.

17       Q.    Did he ever have a copy of it in his

18 possession ever?

19       A.    I don't think so.

20       Q.    If he had given me a copy of those badge

21 numbers, do you think he may have had it?

22       A.    Say that again.

23       Q.    If Joe gave me a copy of badge numbers

24 from 2018 that he bought, don't you think he had a

25 copy?

1        A.     If that occurred, he would have had a

2    copy.  He would have had to get it from me.

3        Q.     You didn't give him a copy of the badge

4    numbers?

5        A.     In my opinion, he never had a reason to

6    have it.  I managed that part of the activity.  It

7    was all access -- he would have had access to all of

8    it at any given time, if he needed to have access.

9        Q.     How would he have access?

10        A.     Because I had the list.

11        Q.     Where did you keep that list?

12        A.     In my possession.  In that briefcase right

13    behind me.

14        Q.     But didn't Joe negotiate the price to pay

15    to the people that owned them?

16        A.     If the customer said, I want 5,000, I'd

17    say, Joe, do you want to pay 5,000 in negotiating.

18    Yes, to that point he negotiated.  He okayed,

19    authorized every price.

20        Q.     And do you recall earlier you told me that

21    Joe gave you the people to go and buy badges from --

22    gave you that information?  Was that not correct?

23        A.     That he did what?  He gave me --

24        Q.     He told you who to go buy badges from,

25    that Joe did?

Jerry Hottle - 11/16/22                                    32

1          A.      Well, we have a list from the previous
2     year, our base list so I knew who we were going to be
3     attempting to buy our badges from.
4          Q.      Does that list -- did that list change a
5     lot from year to year?
6          A.      No.   Other than the ones that for one
7     reason or another, we no longer secured.   Or on the
8     other side of that, would be some new ones that we
9     did secure.
10         Q.      During 2018 before The Masters, do you
11    know whether or not Joe Mullins had a copy of the
12    badges that he purchased in his office?
13         A.      In his personal office?
14         Q.      In his possession at all?
15         A.      I do not know that he -- if he did, I
16    would have given it to him.
17         Q.      But you don't -- you can't sit here today
18    and say that he did not have a list of those badges,
19    can you?
20         A.      No.
21         Q.      I'm sorry.   Let me clarify:   Before the
22    2018 Masters?
23         A.      Did he have a copy -- the question is did
24    he have a copy of that list prior to the 2018
25    Masters?

Q. Right. Before that Thursday when it starts.

A. I actually do not think he had a copy of the list. He had access to it. I had it and he could have had it at any given time by just asking for it. But I don't think he necessarily -- I don't recall ever giving him that list -- that final list, quote/unquote, prior to The Masters. No, I do not.

Q. But that's not quite the question. Let me see if I can give it another way. I need to know you can testify that he did not have a list, unequivocally, prior to the 2018 Masters beginning on that Thursday. Can you say that?

A. No.

Q. Let's go to -- I think I got it here. Did you ever hear a rumor that somebody had turned in Joe's list, the 2018 badges, to Augusta National?

A. No.

Q. What else is highlighted on page 94?

A. Just down through 13, excluding line 12.

Q. Okay. Where is the next highlight?

A. Page 99.

Q. Okay?

A. Line 13, 14, 15, 16, 17, 18.

Q. Okay. Why were these highlighted, if you

1   know?

2          A.      What's the question?

3          Q.      Why were those lines highlighted, if you

4   know?

5          A.      Other than someone made a comment that I

6   told them.  Other than that, I do not know.

7          Q.      All right.  Do you know who made those

8   highlights in this deposition?

9          A.      No.

10          Q.      But it was --

11          A.      This person is saying that I told -- so

12   Jerry told you that Joe -- no, I never -- so Jerry

13   told you that Joe was -- I never told anyone that a

14   list had been turned in because there was no list.

15          Q.      You just testified that you had a list.

16          A.      I have a list.  But they are talking about

17   a specific -- it is my understanding here, they are

18   talking about -- they are talking about the entire

19   list that I use of the names of the people that we

20   buy tickets from.  They are talking about -- from my

21   understanding, they are talking about a list of a

22   certain amount of badges that were turned in to the

23   Augusta National, which there was no special list and

24   the entire list.

25          Q.      How many people are on your list?

```
1        A.     How many people are on the list?

2        Q.     On your list.

3        A.     In 2018?

4        Q.     Yes, sir.

5        A.     We purchased --

6        Q.     Do you have that list with you?

7        A.     No.  I got a number.  2013, there was

8    260 -- 260 badges we purchased.

9               MR. FRAILS:  You said 2013.

10       Q.     (By Mr. Sparks) 2018.

11       A.     2018.

12       Q.     In 2018, what was the number?

13       A.     260.

14       Q.     260?

15       A.     260.

16       Q.     How many pages is that, roughly?

17       A.     Roughly, five.

18       Q.     Is that typewritten or handwritten?

19       A.     It is all handwritten on a preprinted

20   form.  Blanks; you know, preprinted form.

21       Q.     About how many badges per page would that

22   be?  What, 50?

23       A.     Probably more like 40; probably like six

24   pages.

25       Q.     Okay.  Is that information kept on a
```

Jerry Hottle - 11/16/22                                    36

```
1    computer somewhere or is it just a handwritten

2    document?

3         A.    A handwritten record.

4         Q.    Do you have the badge numbers on that

5    list?

6         A.    Yes.

7         Q.    Did Mr. Mullins ever have a copy of that

8    list after 2018, showing the badge number?  Did you

9    give him one?

10        A.    I don't recall ever giving him one, no.

11        Q.    Let's go back to this deposition.  Do you

12   know who highlighted the deposition for you?

13        A.    No.

14        Q.    You didn't do it, I presume?

15        A.    No, I did not.

16        Q.    And it was given to you by Mr. Mullins's

17   counsel already highlighted, right?

18        A.    Correct.

19        Q.    After page 99, where is the next

20   highlight?

21        A.    104.

22        Q.    Which line?

23        A.    Line 8.  And then on --

24        Q.    On line 8?  I'm sorry.

25        A.    -- line 8 and then line 12, line 15, 17,
```

```
 1   18, 19, 20, 21.
 2        Q.     Did you talk to Ian Jack at any time after
 3   the 2018 Masters?
 4        A.     About the 2018 Masters?
 5        Q.     Yes.  I'm sorry.  Yes.
 6        A.     No, not that I recall.
 7        Q.     Did you ever talk to Mr. Jack about the
 8   2019 Masters?
 9        A.     I'm sure I did.
10        Q.     My understanding was that almost
11   immediately after the 2018 Masters, people start
12   agreeing to buy 2019 badges, right?  Is that the way
13   the business works?
14        A.     There is a few, not many.  My activity in
15   securing the badges for the next year usually starts
16   in August perhaps and then heats up in November.
17        Q.     Of course.  All right.  After page 104,
18   when -- what is the next highlight?
19        A.     105, 18 and 19 and 23 through 25.
20        Q.     This refers to -- let's see; do you know
21   about any problems with the badges in 2019, the ones
22   that Joe bought?
23        A.     Any problem being?
24        Q.     Obtaining those badges.
25        A.     Was there any problem with us obtaining
```

1   the badges that Joe bought in 2019?

2        Q.    Yes.  Did he have any trouble getting

3   badges in 2019?

4        A.    No, not that I recall.  The supply had

5   been reduced -- you know, the availability had been

6   reduced because of one thing and another.  We have --

7   somewhat of our portfolio is elderly and some died

8   off and so we didn't get those.

9        Q.    Well, you didn't -- you couldn't purchase

10  the 60 badges that were confiscated by Augusta

11  National in 2018, right?  Those people lost their

12  badges, correct?

13       A.    That's correct.

14       Q.    Did you ever talk with any of those people

15  that owned the 60 badges that got confiscated?

16       A.    Oh, yes.

17       Q.    What did they have to say?

18       A.    They were disappointed.

19       Q.    They were more than disappointed, weren't

20  they?

21       A.    That's correct.

22       Q.    Did any of them threaten lawsuits against

23  Joe and you?

24       A.    Not that I recall.  They all knew -- they

25  all knew, as I do, everyone, what the risk of doing

```
 1   business is with Augusta National badges and/or
 2   tickets.
 3       Q.    Did Joe ever pay any of these people who
 4   owned the 60 badges?  Did he pay them any money
 5   because they lost their badges?
 6       A.    Not that I know of.
 7       Q.    How long have you been working in the
 8   business of buying Masters badges and selling them?
 9       A.    I questioned myself on that.  It probably
10   goes back to 2011 -- '11 or '12.
11       Q.    Do you have a broker's license?
12       A.    No.
13       Q.    In doing business and buying and selling
14   Master badges, are you committing a crime?
15            MR. FRAILS:  Object to the form of the
16       question.
17            MR. SPARKS:  You can answer.
18            THE WITNESS:  I'm not the one buying and
19       selling them, Joe is.  I'm just his --
20       Q.    (By Mr. Sparks) You're just carrying the
21   money, right?
22       A.    Uh-huh.
23       Q.    Is that a yes?
24       A.    I'm just doing what?
25       Q.    Carrying the money.
```

```
 1        A.      Carrying the money?
 2        Q.      Yes.  You go to the bank and get the money
 3   and bring it back?
 4        A.      Yeah, right.
 5        Q.      To give it to the sellers?
 6        A.      That's correct.
 7        Q.      And Joe couldn't do this business without
 8   you, could he?
 9        A.      He could probably find someone else, not
10   as good.
11        Q.      And you keep the list, right?
12        A.      That's correct.
13        Q.      During the time that you have been working
14   in the business of buying and selling Masters badges,
15   it looks like -- let's see; if you had 260 badges in
16   2018 -- let me do some quick math here -- about
17   23 percent of the badges got confiscated by Augusta
18   National, if my math is right.  Other than 2018, has
19   Augusta National confiscated that high of a
20   percentage of the badges that Joe bought and sold?
21        A.      In other years?
22        Q.      Other years, yes, sir.
23        A.      I've never calculated the percentages, no.
24        Q.      What about just a raw number?  Has he ever
25   had 60 badges confiscated by Augusta National?
```

1        A.     In excess of 60, did you say?  Was that
2   the question?
3        Q.     Yes.
4        A.     No.
5        Q.     How many were confiscated in 2019?
6        A.     I know that the 29 tickets that we gave
7   Ian, if that's a good number, they were all used and
8   honored and returned by him to us.  I don't think we
9   had any badges confiscated in 2019.
10        Q.     Okay.  Let's go back to the deposition.
11   Where were we, page 105?
12        A.     Page 105.
13        Q.     Where is the next highlight?
14        A.     107.
15        Q.     107?
16        A.     107, line 5.
17        Q.     There's a statement here I think by Ian
18   Jack.  Essentially, you knew something and Joe knew
19   something.  Is that a fair description of your
20   business relationship with Joe Mullins?
21        A.     It is to the subject that's in question.
22   That is neither Joe or I had had any former knowledge
23   of what was going to occur on the morning on
24   Thursday, 2018.  So what he is saying is that if I
25   was aware of it, Joe was aware of it.  Neither of us

1    were aware of it.

2         Q.     Did you ever offer an opinion as to what

3    could have happened to anybody?

4         A.     Other than what I stated prior is that

5    they randomly check tickets at the gate in the

6    process of that scanning and checking tickets.

7         Q.     So it was random?

8         A.     The National learned that the tickets

9    weren't owned by the people that were using them.

10        Q.     So it's your understanding that Augusta

11   National was randomly checking tickets?

12        A.     I don't know.  I do not think --

13   speculation that they scan every ticket that goes

14   through the gate.  They scan it to see that it's a

15   valid ticket that hasn't been canceled.  If that

16   makes any sense.

17        Q.     It does.  Do you think that it was just

18   random inspection of tickets that caused 28 badges

19   that Ian Jack bought to be confiscated?  Do you think

20   that was just random?

21        A.     He had -- there was an additional -- there

22   was an additional 28 tickets, I think the number

23   is -- I have it somewhere.  There was an additional

24   28 tickets that we sold Ian that were not confiscated

25   at the gate.

1      Q.    So half the tickets got confiscated and

2    half didn't.  Is that what your testimony is?

3      A.    Approximately correct.

4      Q.    So it's your testimony that's a result of

5    random inspections by Augusta National that half of

6    the badges that Ian got were confiscated?

7      A.    I don't know if you can chalk it up to

8    random.  We had the other 32 that were confiscated

9    and I don't recall -- I don't know offhand how many

10   badges those other people received, relative to how

11   many were confiscated.

12     Q.    Did you hear of anyone who was buying

13   badges, say more than 30 or 40 badges, who had 50

14   percent of their badges confiscated by Augusta

15   National?  Did that happen to anybody else?

16     A.    I wouldn't know that.

17     Q.    You live in Augusta.  Did you hear

18   anything about that?

19     A.    No.  It doesn't concern me.

20     Q.    Let's go back to the next highlight.

21   We've done 107, right?

22     A.    198.

23     Q.    198?

24     A.    That's the page number at the top.  It

25   jumped from one --

1          Q.    You didn't seem to have that many pages in
2     your hand.
3          A.    That's what it has at the top.
4          Q.    Okay.  198 and 199.  Let's go to 198.
5          A.    198 is lines 16 through 19, which makes no
6     sense to me.
7          Q.    No.  What is the next highlight?
8          A.    202.
9          Q.    202, what line?
10         A.    Line 14 through 16 and then 18.  That's
11    the last page.
12         Q.    Okay.  We've addressed that.  Now, you
13    said you made some notes on the deposition pages.
14    What notes did you make?
15         A.    I made a note on page 93.
16         Q.    Okay.
17         A.    But I do not recall telling Ian Jack.
18    What did he say?  That I made that statement that he
19    quoted me as making.
20         Q.    Why did you make that note?
21         A.    Why did I make it?
22         Q.    Yes, sir.
23         A.    Because it says that he said Ian -- he
24    said that I said, I can't believe Joe is doing this
25    to you again.  I did not make that statement.

```
 1        Q.    Why did you happen to put a note there --
 2   a handwritten note?
 3        A.    Because I didn't make the statement that
 4   he said I did.  It is not true.
 5        Q.    Did anyone instruct you to put the note
 6   there?
 7        A.    No.  These are my notes.
 8        Q.    Where were you when you made that note?
 9        A.    Where was I?
10        Q.    Yes, sir.
11        A.    I made these notes last night.
12        Q.    Last night.  Okay.  Where is the other
13   note or notes?
14        A.    I have a note over here that there never
15   was any list, quote/unquote.  To me they are
16   indicating there is some kind of list that was
17   furnished to Augusta National.  There is no other
18   list than mine.
19             And then my other note was what we just
20   discussed a little while ago.  There were 260 badges
21   and Ian lost 28 of the total 60 that were lost.  And
22   he did not lose -- I also mentioned earlier he did
23   not lose 28 other badges that he purchased from us
24   where the people went in without any problem
25   whatsoever and which badges he returned to us when
```

```
 1    the tournament was over.

 2         Q.    Okay.

 3         A.    And then on page 94 -- I made a note on 94

 4    in this whole thing is I think Ian is -- this is just

 5    speculation on my part.  I think Ian is confusing

 6    2018 with 2015, as far as quote/unquote list of some

 7    type floating around.

 8         Q.    Why do you say that?

 9         A.    I say that because there was no list in

10    2018.

11         Q.    But this was in '16?

12         A.    No, in '15.  In '15 -- 2015.

13         Q.    What happened in '15?

14         A.    That was the year that an employee

15    furnished a list of names -- not an official list.

16    An official -- I don't know what she furnished.  She

17    furnished a list of names to Austin Rhodes, who in

18    turn, I believe, contacted Augusta National and that

19    is when there was some badges lost.  That's the only

20    time a list, quote/unquote, ever surfaced and was

21    mentioned.

22         Q.    Who was that person?  Do you remember her

23    name?

24         A.    Her name was Heather.  Any more than that,

25    I do not know.  She was an employee of Joe's.
```

1      Q.    And who is Austin Rhodes?   Is he a member

2 of Augusta National?

3      A.    Austin Rhodes is the dude on television --

4 on radio every day.   Austin Rhodes Show.

5      Q.    I'm sorry; I don't know who he is.

6         THE WITNESS:   Well, how would you define

7      his show, Randy?

8      Q.    (By Mr. Sparks) Is he a talk radio person?

9      A.    Yes, three hours every day.

10      Q.    Oh, he is the guy that kept saying bad

11 things about Joe Mullins?

12      A.    That's correct.

13      Q.    Did you put any other notes on the

14 deposition pages?

15      A.    I don't think so but let me look.   Page

16 100, I have a note there was no list.   And my note, I

17 guess, on page 106.   I said if they, meaning they, I

18 didn't write this out.   They, Augusta National, had a

19 list from Mullins, why did they not pick up all of

20 the other 28 of Ian's and the other 200 badges.   If

21 they had a list, why didn't they pick up 260.   There

22 was no list.

23      Q.    Well, it's possible they didn't have the

24 whole list, isn't it?

25      A.    Well, they speak to the fact that the list

```
 1   was never designed because there was no list

 2   regardless of the size of it.

 3        Q.    Right.  But you'll agree that your list is

 4   about five or six pages, right?

 5        A.    That's correct.

 6        Q.    And if Augusta National got a few of those

 7   pages, they probably would have canceled those

 8   badges, right?

 9              MR. FRAILS:  Object to the form of the

10        question.

11              MR. SPARKS:  You can answer.

12        Q.    (By Mr. Sparks) They would cancel the

13   badge numbers that they got regardless of whether or

14   not it was all of the badges, right?  Is that your

15   understanding?

16        A.    No, I don't understand it.  If they got

17   the list -- if Augusta National does what they do, if

18   they got that list of all of those badges, why did

19   they not cancel all of them?  Why did they not just

20   cancel 60?  Twenty-eight of Ian's and 32 of other

21   people?

22        Q.    Right.  My question is if they got a

23   partial list, they would have canceled less than all

24   of Mr. Mullins' badges, right?  They only got part of

25   the list.
```

1        A.      How do you know they only got part of it?

2        Q.      I have no idea.  That's what I'm trying to

3   find out.

4        A.      I don't either.

5        Q.      It's my understanding is if they've got a

6   number of badges, they're canceled?

7        A.      They didn't get a list, period; partial or

8   total.

9        Q.      You don't know that, do you?

10        A.      I don't know where they would have got it.

11        Q.      Right.  We only know they canceled 60

12   badges?

13        A.      Pardon?

14        Q.      You can only say they canceled 60 badges

15   of the ones that Joe Mullins bought?

16        A.      That's correct.

17        Q.      You don't know why, right?

18        A.      I wasn't at the gate so I don't know why.

19        Q.      Other than looking at the pages -- the

20   highlighted pages of the deposition of Ian Jack, did

21   you look at anything else in preparation for the

22   deposition?

23        A.      I'm sorry; say that again.

24        Q.      Did you look at any other document in

25   preparation for the deposition, other than the

```
 1   deposition pages that we've been talking about?
 2        A.    No.
 3        Q.    You have been going back to some documents
 4   in your briefcase.  Do you have documents in your
 5   briefcase concerning the 2018 and 2019 Masters
 6   business of Joe Mullins?
 7        A.    Just my notes.
 8        Q.    Would you give those to Mr. Frails to make
 9   copies?
10        A.    If you can make any sense of it.
11        Q.    Your handwriting can't be as bad as mine,
12   Mr. Hottle.
13        A.    Oh, yes.
14        Q.    Do you mind giving them to Mr. Frails so
15   he can copy and send them over to me?
16             MR. FRAILS:  What am I copying?
17             MR. SPARKS:  Mr. Hottle has documents that
18        he has been referring to and he has documents in
19        his briefcase concerning Joe Mullins 2018, 2019
20        Masters business.  I think we are entitled to
21        those and I would like to get copies.
22             MR. FRAILS:  I think those -- if he has a
23        list, the list is going to be subject to
24        confidentiality.
25             MR. SPARKS:  Absolutely.  I think what we
```

1      do is we put on the record until you and I talk,

2      Mr. Hottle's documents are attorneys' eyes only

3      documents.

4      Q.     (By Mr. Sparks) That means, Mr. Hottle,

5   that only I can see them and then Mr. Mullins'

6   lawyers can see them.  We are not going to disclose

7   them even to the Jacks.  Do you understand that?

8      A.     Yes.

9      Q.     So what I would like for you to agree to,

10  go through your notebook and give to Mr. Frails any

11  document you have concerning 2018, 2019 Masters, so

12  he can make copies and send them to me and I will

13  keep them in confidence.  Is that all right?

14     A.     You are talking about my notes as they

15  refer to the deposition that we just went over?

16     Q.     No, sir.  Everything you have in that

17  briefcase behind you concerning the 2018, 2019

18  Masters.  Under the rules, if you bring documents to

19  a deposition, I get to see them.  But I definitely do

20  not think they should be disclosed to the public and

21  certainly not to Augusta National.  But under the

22  rules, I get to see them to see if there is something

23  I need for this case.

24     A.     You don't need copies of the notes that we

25  discussed going through the deposition?

1    Q.    I do.  I need everything you've got.  All

2    the notes that we discussed and other documents that

3    you have in the briefcase.  Do you mind giving them

4    to Mr. Frails?

5              MR. FRAILS:  You don't have to give them

6         to me now.

7              MR. SPARKS:  Not now.

8              MR. FRAILS:  It is going to take him a

9         minute to get through all of this.

10             MR. SPARKS:  Oh, sure.  What I suggest we

11        do, let's finish this deposition, let me get the

12        documents, and I am not sure I will need to ask

13        any more questions, I probably won't.  But if I

14        absolutely have to, I may ask a few more

15        questions on the record, but I probably won't do

16        that.  Okay?

17             THE WITNESS:  Okay.

18             MR. SPARKS:  Off the record for a second.

19             (Off the record.)

20    Q.    (By Mr. Sparks) In preparation of the

21    deposition, did you talk to Mr. Frails?

22    A.    Briefly.

23    Q.    What did y'all talk about?

24    A.    Nothing other than that copy that he gave

25    me.

1       Q.    What did he tell you about the copy?

2       A.    I don't recall what -- I don't think he

3    told me anything specifically, other than what was --

4    told me to look it over and read it.

5       Q.    Did he tell you to look at the highlighted

6    portions?

7       A.    To make sure I understood it, I read the

8    entire thing several times.

9       Q.    I stepped on you.  I'm sorry.  Did

10   Mr. Frails tell you to look at the highlighted

11   portions?

12      A.    He told me to read the entire thing.

13      Q.    He didn't mention the highlights?

14      A.    He probably did.  I don't recall

15   specifically.

16      Q.    I've got a few questions here and these

17   might seem completely off the wall.  With the

18   information I have, I just want to make sure it's not

19   important.

20            Are you still CEO of the Bay Hill Townhome

21   Association -- Townhome Homeowners Association?

22      A.    No.  I was on the board.  And I was the

23   president of the board for the last three or four

24   years.

25      Q.    That's just the homeowners association

```
 1   where you live?
 2        A.    That's it.  That's correct.
 3        Q.    Do you know a person named Alton Black?
 4        A.    Yes, I do.
 5        Q.    Who is that?
 6        A.    He's a neighbor and an old friend.
 7        Q.    Is he on the home association or was he?
 8        A.    He was on it many years ago, probably ten
 9   years ago.
10        Q.    Is he married to Patricia Black?
11        A.    Yes.
12        Q.    These people may be or have been on the
13   homeowners association.  Daniel Guy?
14        A.    I don't know that name.
15        Q.    Susan Giddens?
16        A.    What was the last name?
17        Q.    G-i-b-b.  I'm sorry; G-i-d-d-e-n-s?
18        A.    I don't know that name.
19        Q.    Melanie, is it Godfrey?  Ever hear of
20   that?
21        A.    Don't know that name.
22        Q.    And Mathis, those are your kids, right?
23        A.    Mathis is --
24        Q.    Grandkids.  I'm sorry.
25        A.    Kid's married name; ain't grandkids.
```

1      Q.    There's Phillip, Morgan, Chris, Kyle.

2  Those are all your grandkids?

3      A.     Phillip Mathis is -- was my daughter's

4  husband.  They are now divorced and he is now

5  deceased.

6      Q.    You are not related to Joe Mullins in any

7  way, are you?

8      A.    No.

9      Q.    Other than working on The Masters, have

10  you ever done business with Joe?

11      A.    No.

12      Q.    Were you ever his banker?

13      A.    Did I ever what?

14      Q.    Were you ever his banker?

15      A.    No.

16      Q.    Did Joe pay you?

17      A.    Yes.

18      Q.    In 2018, 2019?

19      A.    Yes.

20      Q.    How much did he pay you, roughly?

21      A.    About 8,000 a year.

22      Q.    Did he pay you in check or cash?

23      A.    Check.

24      Q.    Did he pay you as a 1099 employee?

25      A.    Yes.

```
 1        Q.     Did he send you a 1099?

 2        A.     No.

 3        Q.     Did you report the 8,000 per year on your

 4   income tax?

 5        A.     No.

 6        Q.     Can you tell me the names of anybody else

 7   that worked for Joe Mullins from 2017 to now -- any

 8   names at all?

 9        A.     I really can't.  I really can't.

10        Q.     Other than taking a check to the bank,

11   getting cash and bringing it back to the office, and

12   then giving the cash to the sellers of the tickets

13   and then giving the badges to the buyers, what else

14   did you do for Joe concerning The Masters?

15        A.     That was it.  I secured the badges from

16   the owners, paid them, and then Joe would direct me

17   who to deliver the badges to.  That person stemmed

18   from him, Ian Jack.

19        Q.     Okay.

20        A.     That was the extent of it, really.

21        Q.     Did you collect the badges at the end of

22   each day or at the end of The Masters?

23        A.     They brought the badges in and we

24   validated, you know, the owner to make certain we had

25   all the badges.
```

1      Q.    Did you do that every day or at the end of

2   The Masters?

3      A.    At the end of The Masters.

4      Q.    Were you aware of any problems in the

5   badges that were supposed to go to Ian Jack for the

6   2019 Masters?

7      A.    No.

8      Q.    Did you have anything to do with Ian Jack

9   concerning the 2019 Masters?

10     A.    I would have delivered the badges to him

11  that we had that Joe had assigned to him.

12     Q.    Did you deliver those badges in 2019?

13     A.    Yeah; he would have either picked them up

14  or I would have delivered them, one or the other.

15     Q.    Do you know if Joe delivered all the

16  badges that Ian Jack bought for the 2019 Masters?

17     A.    I do not know.

18     Q.    Did Joe ever mention to you that he was

19  not going to be able to deliver the badges to Ian

20  Jack for the 2019 Masters?

21     A.    I believe he did in as many words.

22     Q.    Explain that to me.  What do you mean?

23     A.    That he didn't have enough badges to give

24  to everybody, just ones specific to Ian.

25     Q.    Other than Ian Jack, who did not get

1    badges for the 2019 Masters from Joe?

2         A.    I don't know if I have a record of that

3    and if I have actual knowledge of that because he

4    handled that side.  He handled the side of selling

5    the badges that I secured so I'm not certain that I

6    can answer that question.

7         Q.    So your job concerning the badges sold

8    were to deliver the badges to the buyer and then get

9    them at the end of the tournament?

10        A.    Correct.

11        Q.    Did you ever help Joe in 2019 find

12   replacement badges for the ones that Joe did not

13   deliver to Ian Jack in 2019?

14        A.    No, I did not.

15        Q.    You didn't?

16        A.    No.

17        Q.    For the 2019 Masters, did you have any

18   difficulty in buying badges?

19        A.    None other than just the marketplace.  I

20   mean, I don't know if I understand the question.

21        Q.    Well, in 2018 you said you bought

22   260-something badges, right?

23        A.    Yes.

24        Q.    How many did you buy in 2019?

25        A.    I have that figure somewhere.

1       Q.      In your briefcase?

2       A.      Perhaps.  I bought 120.

3       Q.      So you were down 140 badges from '18?

4       A.      Correct.

5       Q.      Why did you only buy 140 badges for '18?

6       A.      Well, 60 of which were lost.

7       Q.      Okay.

8       A.      I can't give you the reason for the

9  rest -- for the other downturn.

10      Q.      How many badges did Joe sell in 2019?

11      A.      I don't know that because he has the

12  documentation on that based on the invoices that he

13  sends out.

14      Q.      When did you know that you were only going

15  to buy 140 badges for 2019?

16      A.      120.

17      Q.      I'm sorry.  120 badges.  I'm sorry.  When

18  did you know that was all that you were going to get?

19      A.      Probably the day before The Masters.

20      Q.      Do you have any records of when you bought

21  badges?

22      A.      No, I do not keep a record of dates.

23      Q.      How many badges had you bought by January

24  of 2019, roughly?

25      A.      I don't have a record by month.

1      Q.    My understanding from what I have done in

2  this case is that right after The Masters, y'all

3  start to secure the badges and it heats up in

4  November, from your testimony.  In November you want

5  to go out and buy the badges, right?

6      A.    We have a very minimum minority of people

7  that will -- you can count on one hand that will

8  negotiate our customers -- at least, that will

9  negotiate with you after The Masters for the

10  following year -- for the next year.  As I stated,

11  sometimes I start in August.  Sometimes I start in

12  November.  Right now it is heating up.

13      Q.    Well, you told me that in November buying

14  badges heated up?

15      A.    That's correct.

16      Q.    So in 2000 -- November of 2018, the

17  business of buying badges would have heated up in

18  November, right?

19      A.    I can't answer that.  I can't answer about

20  2018.  I don't recall.

21      Q.    When did you know that you weren't going

22  to be able to buy 200 -- 200 badges in 2019?  When

23  did you realize that?

24          MR. FRAILS:  Object to form of the

25          question.  It has been asked and answered.

```
 1              MR. SPARKS:  You can answer.

 2        Q.    (By Mr. Sparks) When did you know you

 3   weren't going to get 260 badges?

 4        A.    I don't honestly know specifically when.

 5   I -- I mean, it is an ongoing daily, monthly thing,

 6   you know.  Hey, we lost this, we lost that.  We are

 7   not going to get this.  We are not going to get that.

 8   We're not going to have as many as we did last year.

 9        Q.    Well, is it fair to say that you would

10   want to buy the badges that Joe had already sold,

11   same number?  That was a terrible question.  Let me

12   rephrase it.

13        A.    Okay.

14        Q.    If Joe sold 200 badges for the 2019

15   Masters, it was your job to go out and secure 200

16   badges, right?

17        A.    Right.

18        Q.    And if Joe had been paid for those 200

19   badges, you were kind of obligated to go get them,

20   right?

21              MR. FRAILS:  I'm going to object to the

22        form of the question.

23              MR. SPARKS:  You can answer.

24              THE WITNESS:  I am never under an

25        obligation to get a specific number of badges.
```

```
 1          I secure what I'm able to do.  I don't have any
 2          goals or expectations that I have to meet.
 3          Q.    (By Mr. Sparks) But you agree with me that
 4   Joe has an obligation to provide the badges he sold
 5   and collected money for?
 6               MR. FRAILS:  I'm going to object to the
 7          form of the question.
 8               MR. SPARKS:  You can answer.
 9               THE WITNESS:  I'm never aware of the
10          number of badges that he has sold to these
11          various companies.  All I know is what I'm able
12          to get.
13          Q.    (By Mr. Sparks) Okay.  And is it fair to
14   say if you are not able to get the total number of
15   badges that Joe sold, he was going to have to get
16   them from somebody else, right?
17               MR. FRAILS:  Again, I'm going to object to
18          the form of the question.  He would not have
19          asked Joe and he's already testified to that.
20               MR. SPARKS:  You can answer subject to
21          that objection.
22               THE WITNESS:  I never know what he has
23          sold versus what I have secured.  I don't know
24          that gap.
25          Q.    (By Mr. Sparks) I understand.  But if
```

1   there is a gap, isn't it fair to say that Joe has got

2   to fill that gap?  Right?

3            MR. FRAILS:  Object to the form, again.

4            MR. SPARKS:  You can answer subject to the

5        objection.

6            THE WITNESS:  That is Joe's area, not

7        mine.  Above my pay grade.

8        Q.    (By Mr. Sparks) How long were you a

9   banker?

10       A.    Probably -- well, just 20 years in the

11  bank.  Financial industry before that, American

12  Investment Company, commercial credit, and then bank.

13       Q.    And you can't answer my question?

14       A.    What's the question?

15       Q.    If there's a gap between the number of

16  badges you bought and the number of badges that Joe

17  sold, Joe is going to have to go out and secure that

18  gap, right?

19       A.    I don't know that he has to do -- has to

20  do that.  That is between him and his suppliers.

21       Q.    Or himself.  Other people that buy the

22  badges from him, right?

23       A.    Pardon?

24       Q.    The people that buy badges from him.  Let

25  me back up a little bit.  Do you think Joe needs

1   to -- if somebody buys a badge from Joe, does Joe

2   have an obligation to deliver that badge, in your

3   opinion?

4           MR. FRAILS:  I'm going to object.

5           MR. SPARKS:  He can offer an opinion.

6           MR. FRAILS:  You're asking him to conclude

7       what Joe should do.

8           MR. SPARKS:  I don't need a speaking

9       objection, Randy.  You can object to the form

10      and I will try to correct it or he can answer

11      subject to the objection.

12          MR. FRAILS:  Object to the form of the

13      question, John.

14   Q.    (By Mr. Sparks) Do you agree?

15   A.    Do I agree?

16   Q.    Yes.  If somebody paid money to Joe for a

17   badge, he's obligated to deliver that badge, right?

18   A.    That's his obligation, his responsibility.

19   Q.    Thank you.  Let's move on.

20   A.    I can't speak to that.

21   Q.    And I apologize if you've already told me

22   this.  Did you speak with Ian Jack during the 2019

23   Masters?

24   A.    I probably did in the course of delivering

25   tickets or him picking them up.  That would have been

1    the only reason.

2         Q.    Do you recall delivering any tickets to

3    Ian Jack before the 2019 Masters?

4         A.    Well, they would have all been delivered

5    before The Masters started.  Whatever I delivered

6    would have been prior to the tournament.

7         Q.    But you don't recall actually delivering

8    badges to Ian Jack prior to the 2019 tournament.  I'm

9    just seeing if you remember doing that.

10         A.    Again, I don't want to say I assume that I

11    did.  I either delivered them or he came and picked

12    them up, one or the other.

13         Q.    Would anybody else have delivered them

14    other than you or Joe Mullins?

15         A.    No.

16         Q.    And if Ian Jack did not receive the badges

17    in 2019 that he paid for, you don't recall -- well,

18    let me back up.

19              Do you recall any problem with delivering

20    all of the badges that Ian Jack bought in 2019?

21         A.    No.

22         Q.    I'm going to ask you a series of real

23    quick questions concerning companies that may be

24    owned or operated by Joe Mullins.  I don't know if

25    you have any connection with them, but I just need to

```
 1   get it on the record.   JAM Investments, any
 2   connection?
 3        A.    No.
 4        Q.    Jessie Farrell, LLC, any connection?
 5        A.    No.
 6        Q.    Jessie Grace Jr., LLC, any connection?
 7        A.    No.
 8        Q.    Morgan Grace, Jr., LLC, any connection?
 9        A.    No.
10        Q.    Mullins Properties 1, any correction?
11        A.    No.
12        Q.    Mullins Properties 2, any connection?
13        A.    No.
14        Q.    Mullins Properties 3, LLC, any connection?
15        A.    No.
16        Q.    Mullins Properties 10, any connection?
17        A.    No.
18        Q.    Mullins Property, LLC, any connection?
19        A.    No.
20        Q.    Pine Needle Ranch, LLC?
21        A.    No.
22        Q.    Any connection?
23        A.    No.
24        Q.    Grace T. Chastin, Jr., LLC?
25        A.    No.
```

Jerry Hottle - 11/16/22                    67

```
 1        Q.     T. Chastin Grace, Jr., LLC?

 2        A.     No.

 3        Q.     Mullins Company, LLC?

 4        A.     No.

 5        Q.     Mullins Management, LLC?

 6        A.     No.

 7        Q.     Mullins Sports and Entertainment?

 8        A.     Yes.

 9        Q.     That's the one that you dealt with The

10   Masters?

11        A.     Correct.

12        Q.     Did you ever do any work for Mullins

13   concerning his real estate or his company's real

14   estate?

15        A.     No.

16        Q.     Was it your practice to keep up with the

17   price Mullins paid for badges?

18        A.     Keep up with the price that he paid that

19   we --

20        Q.     Yes.  That you paid the owners for.  Did

21   you keep that on your list?

22        A.     Pardon?

23        Q.     Did you keep that information that John

24   Doe received X dollars for 2018 badges?  Did you keep

25   those records?
```

Jerry Hottle - 11/16/22                    68

1        A.     No.   I mean, most of those were kept out

2   of -- most of them would be kept out of the records

3   and kept, I'm guessing, with the accounting area.

4        Q.     Would that have been Jeff Mullins'

5   obligation to keep that?

6        A.     Yes.

7        Q.     Did you give Jeff Mullins information

8   about the price paid for a badge?

9        A.     Yes.

10       Q.     How did you give it to him, in written

11  form or orally?

12       A.     Both.

13       Q.     And then Jeff would record it in the books

14  and that's it?

15       A.     Yes.

16       Q.     Did you keep any of those paper records or

17  did you get rid of those?

18       A.     I do not think I have them.

19       Q.     I'm just going through these questions.   I

20  have already asked all of these.

21              Did you and Joe Mullins ever talk about

22  Ian Jack and any problems concerning 2018?

23       A.     Define problem.   I don't know what you

24  mean.

25       Q.     Well, Ian said he didn't get all of the

1    badges -- or that some of the badges were confiscated

2    by Augusta National.  Did you and Joe talk about

3    that?

4         A.    I'm sure we did.

5         Q.    Do you recall any of those conversations?

6         A.    No, I do not.  They would have been the

7    same conversation we had with the others that were

8    confiscated.

9         Q.    Did you ever talk to him by a text or

10   e-mail concerning Ian Jack and the 2018 Masters?

11        A.    I would have to say no, by text or e-mail.

12        Q.    You don't keep your texts or e-mails,

13   right?

14        A.    No.

15        Q.    What about the 2019 Masters?  Did you and

16   Joe Mullins talk about problems concerning Ian Jack's

17   tickets and badges in 2019?

18        A.    I did not.

19        Q.    And if you had any texts going back and

20   forth, you wouldn't have those?

21        A.    No.

22        Q.    Same thing with e-mails?

23        A.    Going back and forth specifically about?

24        Q.    About Ian Jack in 2019.

25        A.    No, I do not have any.

1      Q.     When is the last time you talked to Joe?

2      A.     Yesterday.

3      Q.     What did y'all talk about?

4      A.     What did we talk about.  Talked

5   about -- he gave me an okay on a couple of badges I

6   got a price on and gave me a turn down on a couple

7   others, price too high, and that was the extent of

8   it, I think.

9      Q.     Have you and Joe ever talked about Ian

10  Jack or this lawsuit?

11     A.     Specif -- no.  I don't know the details

12  about any of this.

13     Q.     I'm not asking the details.  I'm just

14  wondering if you and Joe talked about this lawsuit or

15  the claims in this lawsuit?

16     A.     No, I have not.

17     Q.     So Joe is in the business still of buying

18  and selling Masters badges?

19     A.     At the moment, as of now.

20     Q.     So that would be for the 2023 Masters?

21     A.     Correct.

22     Q.     Without telling me names, how many badges

23  have you been able to buy for Joe for the 2023

24  Masters?

25     A.     Well, when you say able to buy, at this

1    point in time, there is no money transacted.  It is

2    kind of like promises.

3         Q.    Yes.  I understand.

4         A.    Okay.

5         Q.    How many badges are promised?

6         A.    I don't have a current tally on that but I

7    would guess 25; no more than 30.

8         Q.    Okay.  Is it -- forgive me, because I

9    don't know the business.  Having secured promises for

10   25 or 30 badges by November -- what is it, 16th? --

11   is that about normal for acquiring badges or would

12   you expect to have a lot more by now?

13        A.    I would hope to have more, but it's not

14   going well.  Each year that goes by, people think the

15   value of that ticket has gone up and they won't agree

16   to the price, which hinders the price of securing

17   them because we have to negotiate -- or Joe has to

18   negotiate so that is why that process has slowed up.

19        Q.    Okay.  Well, what are the prices going for

20   this year -- for 2023?

21        A.    It depends on who you talk to.

22        Q.    For you.  You have 25 to 30 promises,

23   what's the price range?

24        A.    All of them are below.  Price range is

25   probably 4,000 to 6,000, several may be a couple over

1    that.

2         Q.    Is there any difference between a $4,000

3    badge and a $6,000 badge, other than the owner's

4    ability to negotiate?

5         A.    That's it.

6         Q.    It's just a badge.  Okay.  When would the

7    owners of the badge expect payment for the badge?

8    When does that happen?

9         A.    When they deliver the badge.

10        Q.    And when would that be?  I don't know.

11        A.    It depends on the National when they send

12   them out.  It is a different date every year.  When

13   those tickets hit the street, you got half of your

14   people are on the phone wanting to deliver the badge

15   and get the money and the other people just whenever.

16        Q.    I mean, does it usually hit in January?

17   February?

18        A.    No.  They don't deliver the badges to the

19   badge owners until around the first week of March.

20        Q.    Wow.  Okay.  Now, the 25 or 30 people that

21   you got promises from, are those some of the same

22   people that you bought badges from in the past?

23        A.    Yes.

24        Q.    Any new people that you recall?

25        A.    New this year?  No.

1      Q.    Have you made calls to -- what was it --

2   how many did you get last year to all the people you

3   secured badges for 2000 -- wait a minute.  Did the

4   2021 Masters occur?  I think it did, didn't it?

5      A.    2022.

6      Q.    '22.  I'm sorry.  I was in the wrong year.

7   It occurred, right?

8      A.    Yes.

9      Q.    And you bought badges and Joe sold badges

10  for '22, right?

11     A.    Correct.

12     Q.    How many did you buy in '22, roughly?

13     A.    I already gave you that figure.  It was

14  like 140, wasn't it?

15     Q.    No, that was '20.

16     A.    Oh, '22.  It wasn't --

17     Q.    I'm getting all confused.  The Masters in

18  '20 was a mess, wasn't it?

19     A.    Yeah, '20 and '21 did not occur.

20     Q.    So we were in '22.  Okay.

21     A.    '22 was the last, quote/unquote,

22  full-blown Masters.  I don't know.

23     Q.    Mr. Hottle --

24     A.    I don't know if I have those figures.

25     Q.    If you have them and in your notebook,

```
 1    we'll get them.  Of the badges that you secured for
 2    the last year, have you contacted all of those people
 3    to see if you can buy them for '23?
 4         A.    I have attempted.  I have not made contact
 5    with some.  Some of these people are not going to
 6    discuss, negotiate, and talk until after they are
 7    assured that they're getting the badges.  The
 8    National sends out that e-mail to all of the people
 9    that are entitled to receive a badge for '23 on the
10    last day of '22.  And once those people get that
11    validation that they're going to get the badge, then
12    a good many of them will talk with you.
13         Q.    Okay.  So the way it works, Augusta
14    National sends an e-mail December 31st to the people
15    that can get badges.  And, then, you can go talk to
16    people because they know they will get the badges?
17         A.    Yes.
18         Q.    I see.  And you won't know who gets that
19    e-mail until it goes out, right?
20         A.    That's correct.  That's when it is hot and
21    heavy, January the 3rd.
22         Q.    Now, Mr. Hottle, you have the right to
23    read the transcript of your deposition and make
24    corrections if you need to and sign it, or you can
25    waive that right.  Would you like to read and then
```

```
 1   sign it?
 2        A.    Yes.
 3        Q.    Subject to any questions -- let's also
 4   make sure this is on the record.  You are going to
 5   give Mr. Frails the documents that you have in your
 6   notebook.  He is going to send them to me stamped
 7   attorney eyes only.  Do you agree?
 8        A.    Yes.
 9             MR. SPARKS:  And you are going to send me,
10        Randy, the highlighted?
11             MR. FRAILS:  It has already been sent.
12             MR. SPARKS:  Okay.  I haven't looked.
13        With that, Mr. Hottle, that's all I have.  I
14        don't know if Randy has any.
15             MR. FRAILS:  Mr. Hottle, I have a few
16        questions.
17                        EXAMINATION
18   BY MR. FRAILS:
19        Q.    Mr. Sparks asked you about how many badges
20   that you had promises for the year 2023.  I believe
21   you mentioned you had 25 or 30; is that correct?
22        A.    Correct.
23        Q.    And that money doesn't change hands until
24   the delivery of the badge; is that correct?
25        A.    Correct.
```

1        Q.      You indicated money for the badge is

2    somewhere after March?

3        A.      Correct.

4        Q.      Let me ask you this.  What can happen with

5    the promise and actually delivering the badge?

6        A.      What happens?  You hope that they honor

7    their agreement.

8        Q.      Do they honor -- do all parties honor

9    their agreement?

10       A.      Not all of them, no.

11       Q.      And have you had occasion where people did

12   not honor their agreement, did not provide a badge?

13       A.      That's correct.

14       Q.      Have there been times when you have -- in

15   order to secure a badge, do y'all pay these badge

16   holders a deposit?

17       A.      In some cases we do.

18       Q.      Have there ever been occasions where you

19   paid badge holders a deposits that did not honor the

20   badges?

21       A.      That's correct.

22       Q.      You testified earlier that these badge

23   sellers, advanced holders are aware of the risk.  Can

24   you just expound on that a bit?  What do you mean by

25   the risk?

```
1        A.     Well, they know, in my opinion, the back
2   of the badge lays out their risk that they cannot
3   resell the badge.  And they all know that.  In fact,
4   if occasion presents itself, I restate that to them.
5   Not in every purchase I don't.  I mean, these are old
6   customers and they know the risks.
7        Q.     And there has been some testimony about a
8   list for 2018 that possibly went to Augusta National.
9   I believe you testified earlier that you thought
10  Mr. Jack was confused?
11       A.     I think he was confused because there was
12  no list or partial list or any type of list that
13  could have gone to Augusta National for the names
14  that were on the 2018 list, which is always in my
15  possession.
16       Q.     Let me ask you this:  These badges that
17  were confiscated based upon your list -- and I know
18  there was some testimony about, well, maybe Augusta
19  National got a page.  Did all of the confiscated
20  badges come off the same page?
21       A.     No.
22       Q.     On your list have you designated which
23  badges were confiscated for 2018?
24       A.     Yes.
25       Q.     And you have that information?
```

1        A.     I do.

2        Q.     If there was a list -- let me ask you

3    this.  Let me clarify my question.  Have you

4    contacted Augusta National and asked them did they

5    have a list for 2018?

6        A.     No.

7        Q.     Would you agree with me that if there was

8    a list, the best way to determine that list exists

9    would be to ask Augusta National?

10       A.     Yes.

11       Q.     But as far as you know, there is no list

12   of names that got turned in to Augusta National?

13       A.     There was none.

14       Q.     And you -- and I believe you testified

15   earlier, to your knowledge, you never turned over the

16   list of people that you were buying badges to -- for

17   2018.  You never turned this list over to Joe, to

18   your knowledge?

19       A.     No.

20       Q.     Are you certain about that?

21       A.     (No response.)

22       Q.     What about after this lawsuit was filed?

23   Did you turn over the list to him after this lawsuit

24   was filed?

25       A.     I don't recall him ever asking me for my

 1   list; no.
 2        Q.    I'm going to go back a little bit.  Tell
 3   me again what happened in 2015.
 4        A.    2015 is when this employee of Joe's by the
 5   name of Heather, for Lord knows why, she -- she
 6   secured the names of people we had bought badges from
 7   and I don't know whether she ever supplied it to
 8   Augusta National.  But I know she supplied it to -- I
 9   am of the opinion she supplied it to Austin Rhodes.
10   And whether or not she gave it to the National or
11   Austin Rhodes gave it to the National, I don't know
12   which.  And as a result of that, we lost 44 badges
13   which were names on different pages of that current
14   list for 2015.  They were not all one page, like you
15   just referenced for 2019.
16        Q.    Did you ever have any conversations with
17   Ian Jack concerning 2015?  And that will be from
18   2015, '16, '17, '18.
19        A.    No.  I can't recall any.  I really can't.
20        Q.    Well, you testified you believe that is
21   what he is referring to.  How would you come to that
22   conclusion?
23        A.    I guess it was -- gosh, I don't know.
24   Perhaps I had a conversation about that but it got to
25   be -- it got to be -- I don't want to say street

1    knowledge, but it got to be rumored that's what

2    occurred among the people that are involved in these

3    activities.

4          Q.    That's what occurred in 2015?

5          A.    Yes.

6                MR. FRAILS:  Can you hold on one moment?

7          I need to consult with Tameka.

8                MR. SPARKS:  Sure.

9                MR. FRAILS:  I may be done.

10                (Recess from 5:34 p.m. to 5:36 p.m.)

11          Q.    (By Mr. Frails) Mr. Hottle, in our

12    conversations did at any time I ask you to be

13    untruthful in your deposition?

14          A.    No.

15          Q.    And have you been truthful in your

16    deposition?

17                MR. SPARKS:  I'm going to object to the

18          form.

19                MR. FRAILS:  I don't have any further

20          questions.

21                MR. SPARKS:  I just have one and I

22          apologize.

23                          EXAMINATION

24    BY MR. SPARKS:

25          Q.    You have your list -- the list of badges

```
 1    that you buy for Joe Mullins is a handwritten list,
 2    right?
 3         A.    Correct.
 4         Q.    And who has access to that list other than
 5    you?
 6         A.    Only Joe if he requests it.
 7         Q.    Do you have that list with you when you go
 8    to Joe's office?
 9         A.    Usually.
10         Q.    Do you talk to Joe in his office about
11    people on that list?
12         A.    Yes.
13         Q.    Could somebody in Joe's office hear the
14    names of people that are on that list?
15         A.    No one else in the office when I talk to
16    him about it.
17         Q.    Do you ever leave the list outside of your
18    presence?
19         A.    No.
20         Q.    You always keep the briefcase with you?
21         A.    Yes.  That briefcase is about 50 years
22    old.
23               MR. SPARKS:  Thank you.
24               MR. FRAILS:  I don't have any further
25         questions.
```

1             COURT REPORTER:  Counsel, are you going to

2       order the transcript?

3             MR. SPARKS:  I only want the electronic

4       copy.  Yes.

5             MR. FRAILS:  That's right.

6             MR. SPARKS:  And I believe he is going to

7       read and sign.  I don't mind if you send that

8       copy to Mr. Frails and then Mr. Hottle can read

9       it.  Does that work?

10            MR. FRAILS:  Yes, that will work.

11            And, Mr. Hottle, when you read it if

12      there's something that's -- you know, a date

13      wrong or something like that or if there's a

14      misstatement, you are going to have to deal with

15      that yourself.  You can't really consult with me

16      about that.  You have to do that and make those

17      changes and that will be what we call on an

18      errata sheet and you can refer to any changes

19      you make on there, if there are any.

20            (Deposition concluded at 5:38 p.m.)

21            (Pursuant to Rule 30(e) of the Federal

22      Rules of Civil Procedure and/or O.C.G.A.

23      9-11-30(e), signature of the witness has been

24      reserved.)

25

DISCLOSURE OF NO CONTRACT

    I, Colleen Lee, do hereby disclose pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that Professional Court Reporters LLC was contacted by the party taking the deposition to provide court reporting services for this deposition and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board of Court Reporting for the taking of this deposition.

    There is no contract to provide reporting services between Professional Court Reporters LLC or any person with whom Professional Court Reporters LLC has a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action.  Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

    This 29th day of November, 2022.


_____
Colleen Lee, RPR, CCR

DISCLOSURE OF NO CONTRACT - BY FIRM

I, Kerry Anderson, do hereby disclose pursuant
to Article 10.B of the Rules and Regulations of the
Board of Court Reporting of the Judicial Council of
Georgia that Professional Court Reporters LLC was
contacted by the party taking the deposition to
provide court reporting services for this deposition
and there is no contract that is prohibited by
O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
Rules and Regulations of the Board of Court Reporting
for the taking of this deposition.

There is no contract to provide reporting
services between Professional Court Reporters LLC or
any person with whom Professional Court Reporters LLC
has a principal and agency relationship nor any
attorney at law in this action, party to this action,
party having a financial interest in this action, or
agent for an attorney at law in this action, or agent
for an attorney at law in this action, party to this
action, or party having a financial interest in this
action.  Any and all financial arrangements beyond
our usual and customary rates have been disclosed and
offered to all parties.

This 29th day of November, 2022.

_____
Kerry Anderson, RPR, CCR
Professional Court Reporters LLC

                    CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA       )

COUNTY OF GLYNN        )

            I hereby certify that the foregoing

caption, and the questions and answers thereto were

reduced to writing by me; that the total transcript

pages 1 through 86 represent a true, correct, and

complete transcript of the evidence given on

Wednesday, November 16, 2022, by the witness, JERRY

HOTTLE, who was first duly sworn by me.

            I certify that I am not disqualified

for a relationship of interest under

O.C.G.A. 9-11-28(c); I am a Georgia Certified Court

Reporter here as a representative of Professional

Court Reporters LLC; I was contacted by Professional

Court Reporters LLC to provide court reporting

services for the deposition; I will not be taking

this deposition under any contract that is prohibited

by O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of

the Rules and Regulations of the Board of Court

Reporting.

     This 29th day of November 2022.

                         _____
                         Colleen Lee, RPR, CCR-2799
                         Georgia Certified Court Reporter

ERRATA SHEET

    I, JERRY HOTTLE, the witness herein, do hereby
certify that I have read the transcript of November
16, 2022, of my deposition testimony, and the same is
true and correct, to the best of my knowledge, with
the exception of the following changes noted below,
if any:

Page No.         Line No.         should read:


Reason for change:

Page No.         Line No.         should read:


Reason for change:

Page No.         Line No.         should read:


Reason for change:

Page No.         Line No.         should read:


Reason for change:

Page No.         Line No.         should read:


Reason for change:

Page No.         Line No.         should read:


Reason for change:


                  JERRY HOTTLE

Sworn to and subscribed before me,
the undersigned notary public, on
this      day of            .


Notary Public

**$**

**$10,000 (1)**
28:10
**$14- (2)**
27:16,21
**$4,000 (1)**
72:2
**$6,000 (1)**
72:3

**A**

**ability (2)**
8:9;72:4
**able (7)**
57:19;60:22;62:1,
11,14;70:23,25
**Above (1)**
63:7
**Absolutely (2)**
50:25;52:14
**access (7)**
30:15;31:7,7,8,9;
33:4;81:4
**accounting (1)**
68:3
**acquiring (1)**
71:11
**activities (2)**
22:22;80:3
**activity (5)**
23:5,25;24:12;
31:6;37:14
**actual (1)**
58:3
**Actually (5)**
8:2;11:1;33:3;
65:7;76:5
**additional (4)**
19:10;42:21,22,23
**address (2)**
5:6;6:20
**addressed (1)**
44:12
**advanced (1)**
76:23
**afternoon (1)**
8:3
**again (9)**
17:21;21:18;
30:22;44:25;49:23;
62:17;63:3;65:10;
79:3

**against (1)**
38:22
**ago (4)**
7:15;45:20;54:8,9
**agree (10)**
4:13,14;48:3;51:9;
62:3;64:14,15;
71:15;75:7;78:7
**agreeing (1)**
37:12
**agreement (3)**
76:7,9,12
**aids (1)**
4:23
**ain't (1)**
54:25
**almost (1)**
37:10
**Alton (1)**
54:3
**always (4)**
15:6;28:25;77:14;
81:20
**American (1)**
63:11
**among (1)**
80:2
**amount (1)**
34:22
**and/or (3)**
24:22;39:1;82:22
**answer (18)**
4:12;7:13;8:10;
17:19,20;27:8;
39:17;48:11;58:6;
60:19,19;61:1,23;
62:8,20;63:4,13;
64:10
**answered (1)**
60:25
**apologize (2)**
64:21;80:22
**appointment (1)**
25:22
**appointments (1)**
25:23
**Approximately (1)**
43:3
**area (2)**
63:6;68:3
**Army (3)**
10:13,15,16
**around (7)**
8:14,21;9:4,13;
30:12;46:7;72:19

**arrested (1)**
11:11
**Article (1)**
4:2
**assigned (1)**
57:11
**associated (1)**
21:13
**Association (5)**
53:21,21,25;54:7,
13
**assume (1)**
65:10
**assured (1)**
74:7
**AT&T (1)**
7:10
**attempted (1)**
74:4
**attempting (1)**
32:3
**attorney (1)**
75:7
**attorneys' (1)**
51:2
**August (2)**
37:16;60:11
**Augusta (49)**
8:15,21;9:4,13;
10:12,14,18,19;
15:19;16:24;17:23;
18:2,8,10,18,22;
21:5,12,19;22:1,7,
16;33:17;34:23;
38:10;39:1;40:17,19,
25;42:10;43:5,14,17;
45:17;46:18;47:2,
18;48:6,17;51:21;
69:2;74:13;77:8,13,
18;78:4,9,12;79:8
**Austin (6)**
46:17;47:1,3,4;
79:9,11
**authorized (1)**
31:19
**availability (1)**
38:5
**available (3)**
25:15,19,21
**aware (7)**
8:11;41:25,25;
42:1;57:4;62:9;
76:23

**B**

**Back (18)**
5:2;24:17;25:6,15;
27:22;36:11;39:10;
40:3;41:10;43:20;
50:3;56:11;63:25;
65:18;69:19,23;
77:1;79:2
**bad (3)**
4:21;47:10;50:11
**badge (46)**
21:7,13,20;22:9;
24:11,12,16,17;26:1,
23;27:3,4,7,11;
28:15;30:20,23;
31:3;36:4,8;48:13;
64:1,2,17,17;68:8;
72:3,3,6,7,7,9,14,19;
74:9,11;75:24;76:1,
5,12,15,19,22;
77:2,3
**badges (176)**
15:8,14,17,19,22;
16:2,3,5,15,18;
17:12,16;18:1,4,9,
18,23;19:1,5,7,10,19,
21,22,25;20:3,4,8,
21;21:16,21;22:1,11,
17;24:10;25:2,6,18,
19,20;26:4,7,11,14,
17;27:13,15,17,22;
28:7;30:9,11,14;
31:21,24;32:3,12,18;
33:17;34:22;35:8,
21;37:12,15,21,24;
38:1,3,10,12,15;
39:1,4,5,8,14;40:14,
15,17,20,25;41:9;
42:18;43:6,10,13,13,
14;45:20,23,25;
46:19;47:20;48:8,14,
18,24;49:6,12,14;
56:13,15,17,21,23,
25;57:5,10,12,16,19,
23;58:1,5,7,8,12,18,
22;59:3,5,10,15,17,
21,23;60:3,5,14,17,
22;61:3,10,14,16,19,
25;62:4,10,15;63:16,
16,22,24;65:8,16,20;
67:17,24;69:1,1,17;
70:5,18,22;71:5,10,
11;72:18,22;73:3,9,

9;74:1,7,15,16;
75:19;76:20;77:16,
20,23;78:16;79:6,12;
80:25
**bank (11)**
10:25;25:12,13;
26:7;27:21;28:9,18;
40:2;56:10;63:11,12
**banker (4)**
28:22;55:12,14;
63:9
**Banker's (1)**
11:1
**banking (3)**
10:23;28:25;29:3
**bankruptcy (1)**
11:7
**base (1)**
32:2
**based (2)**
59:12;77:17
**basically (1)**
10:23
**basis (1)**
30:16
**Bay (1)**
53:20
**became (1)**
25:19
**begin (1)**
17:1
**beginning (1)**
33:12
**behind (2)**
31:13;51:17
**below (1)**
71:24
**best (2)**
15:24;78:8
**Bethlehem (1)**
10:11
**bit (4)**
17:11;63:25;
76:24;79:2
**Black (2)**
54:3,10
**blank (1)**
14:4
**Blanks (1)**
35:20
**Board (3)**
4:3;53:22,23
**books (1)**
68:13
**born (1)**

8:12
**Both (1)**
68:12
**bottle (1)**
8:19
**bought (22)**
14:18,22;15:15;
18:23;22:9;25:2;
30:24;37:22;38:1;
40:20;42:19;49:15;
57:16;58:21;59:2,20,
23;63:16;65:20;
72:22;73:9;79:6
**Boys (1)**
9:8
**brief (1)**
12:18
**briefcase (9)**
31:12;50:4,5,19;
51:17;52:3;59:1;
81:20,21
**Briefly (1)**
52:22
**bring (8)**
14:5,11;25:15;
26:11;27:22,22;
40:3;51:18
**bringing (1)**
56:11
**broad (1)**
15:17
**broker's (1)**
39:11
**brought (1)**
56:23
**Bruce (1)**
9:9
**bucks (1)**
28:14
**business (13)**
37:13;39:1,8,13;
40:7,14;41:20;50:6,
20;55:10;60:17;
70:17;71:9
**buy (22)**
18:9;25:16,18,19;
31:21,24;32:3;
34:20;37:12;58:24;
59:5,15;60:5,22;
61:10;63:21,24;
70:23,25;73:12;
74:3;81:1
**buyer (1)**
58:8
**buyers (1)**

56:13
**buying (12)**
24:10;26:17;39:8,
13,18;40:14;43:12;
58:18;60:13,17;
70:17;78:16
**buys (1)**
64:1

## C

**calculated (1)**
40:23
**call (2)**
16:8;82:17
**called (3)**
14:4;16:6,9
**calls (1)**
73:1
**came (6)**
14:5,10;21:6,7;
25:22;65:11
**can (35)**
17:18,20;32:19;
33:10,11,13;39:17;
43:7;48:11;49:14;
50:10,15;51:5,6,12;
56:6;58:6;60:7;61:1,
23;62:8,20;63:4;
64:5,9,10;74:3,15,
15,24;76:4,23;80:6;
82:8,18
**cancel (1)**
48:12,19,20
**canceled (6)**
42:15;48:7,23;
49:6,11,14
**carrying (3)**
39:20,25;40:1
**case (3)**
4:9;51:23;60:2
**cases (1)**
76:17
**cash (22)**
24:20,22,25;25:8,
11,12,13,14,15,17,
18;26:7,12;27:20;
28:2,4,7,15,19;
55:22;56:11,12
**caused (2)**
22:16;42:18
**cell (2)**
5:12,14
**CEO (1)**
53:20

**certain (6)**
14:23;16:10;
34:22;56:24;58:5;
78:20
**Certainly (2)**
18:12;51:21
**chalk (1)**
43:7
**challenged (1)**
7:12
**change (2)**
32:4;75:23
**changes (2)**
82:17,18
**Chastin (2)**
66:24;67:1
**check (16)**
17:24;21:7;24:22,
25;25:9,11,14,17;
26:6,12;27:20;
28:12;42:5;55:22,
23;56:10
**checked (1)**
21:13
**checking (2)**
42:6,11
**checks (2)**
28:3,10
**children (1)**
9:3
**child's (1)**
9:10
**Chris (1)**
55:1
**Civil (1)**
82:22
**claims (1)**
70:15
**clarify (2)**
32:21;78:3
**clients (1)**
24:11
**clue (1)**
18:11
**collect (1)**
56:21
**collected (1)**
62:5
**college (1)**
11:5
**coming (1)**
22:9
**comment (1)**
34:5
**commercial (1)**

63:12
**committing (1)**
39:14
**common (1)**
18:1
**communicate (2)**
6:15,18
**communicated (1)**
6:23
**companies (4)**
5:10;20:12;62:11;
65:23
**company (4)**
20:14,16;63:12;
67:3
**company's (1)**
67:13
**completely (2)**
8:10;53:17
**computer (1)**
36:1
**concern (2)**
12:25;43:19
**concerning (16)**
15:7,18;22:11;
50:5,19;51:11,17;
56:14;57:9;58:7;
65:23;67:13;68:22;
69:10,16;79:17
**conclude (1)**
64:6
**concluded (1)**
82:20
**conclusion (1)**
79:22
**confidence (1)**
51:13
**confidentiality (1)**
50:24
**confiscate (4)**
18:19,22;22:13,17
**confiscated (45)**
15:20,22;16:3,6,
15,19,21;18:21;19:1,
3,6,8,10,19,21,22;
20:1,4,5,6,9,22,23,
24;21:2;22:1;38:10,
15;40:17,19,25;41:5,
9;42:19,24;43:1,6,8,
11,14;69:1,8;77:17,
19,23
**confused (3)**
73:17;77:10,11
**confusing (1)**
46:5

**congratulations (1)**
10:7
**connection (10)**
65:25;66:2,4,6,8,
12,14,16,18,22
**consult (2)**
80:7;82:15
**contact (1)**
74:4
**contacted (3)**
46:18;74:2;78:4
**conversation (3)**
6:14;69:7;79:24
**conversations (3)**
69:5;79:16;80:12
**convicted (1)**
11:11
**copies (5)**
6:9;50:9,21;51:12,
24
**copy (16)**
30:17,20,23,25;
31:2,3;32:11,23,24;
33:3;36:7;50:15;
52:24;53:1;82:4,8
**copying (1)**
50:16
**corner (1)**
12:4
**Correct (38)**
10:2;15:9;18:3;
20:2;24:19;25:7;
26:5;27:12,18,24;
31:22;36:18;38:12,
13,21;40:6,12;43:3;
47:12;48:5;49:16;
54:2;58:10;59:4;
60:15;64:10;67:11;
70:21;73:11;74:20;
75:21,22,24,25;76:3,
13,21;81:3
**correction (1)**
66:10
**corrections (1)**
74:24
**Council (1)**
4:3
**counsel (2)**
36:17;82:1
**count (1)**
60:7
**couple (4)**
11:15;70:5,6;
71:25
**course (4)**

4:17;15:23;37:17;
64:24
**Court (3)**
4:3;5:7;82:1
**credit (1)**
63:12
**crime (1)**
39:14
**current (4)**
5:6;7:1;71:6;79:13
**customer (1)**
31:16
**customers (3)**
30:11;60:8;77:6

**D**

**daily (1)**
61:5
**Daniel (1)**
54:13
**date (2)**
72:12;82:12
**dates (1)**
59:22
**daughter's (1)**
55:3
**day (9)**
6:13;10:17;29:15;
47:4,9;56:22;57:1;
59:19;74:10
**day-to-day (1)**
30:16
**deal (2)**
29:4;82:14
**dealt (1)**
67:9
**deceased (1)**
55:5
**December (1)**
74:14
**define (2)**
47:6;68:23
**definitely (1)**
51:19
**deliver (10)**
56:17;57:12,19;
58:8,13;64:2,17;
72:9,14,18
**delivered (7)**
57:10,14,15;65:4,
5,11,13
**delivering (5)**
64:24;65:2,7,19;
76:5

**delivery (1)**
75:24
**depended (1)**
24:22
**depends (2)**
71:21;72:11
**deposit (1)**
76:16
**deposition (32)**
4:8,18;7:14,16;
11:13,14,19,21,23,
24;23:12;29:8,18;
34:8;36:11,12;
41:10;44:13;47:14;
49:20,22,25;50:1;
51:15,19,25;52:11,
21;74:23;80:13,16;
82:20
**deposits (1)**
76:19
**description (1)**
41:19
**designated (1)**
77:22
**designed (1)**
48:1
**details (2)**
70:11,13
**determine (1)**
78:8
**determining (1)**
28:2
**developing (1)**
29:1
**died (1)**
38:7
**difference (1)**
72:2
**different (2)**
72:12;79:13
**difficulty (1)**
58:18
**direct (1)**
56:16
**directly (1)**
18:10
**disappointed (2)**
38:18,19
**disclose (1)**
51:6
**disclosed (1)**
51:20
**disclosure (1)**
4:1
**discuss (1)**

74:6
**discussed (4)**
20:25;45:20;
51:25;52:2
**discussing (1)**
23:20
**disgruntled (3)**
13:2,5,9
**disgusted (3)**
15:13;23:17,18
**divorced (1)**
55:4
**document (3)**
36:2;49:24;51:11
**documentation (1)**
59:12
**documents (11)**
12:16;50:3,4,17,
18;51:2,3,18;52:2,
12;75:5
**Doe (1)**
67:24
**dollars (1)**
67:24
**done (4)**
43:21;55:10;60:1;
80:9
**down (5)**
17:11;23:13;
33:20;59:3;70:6
**downturn (1)**
59:9
**dude (1)**
47:3
**duly (1)**
4:6
**during (5)**
4:17;15:23;32:10;
40:13;64:22

**E**

**ear (1)**
4:22
**earlier (5)**
31:20;45:22;
76:22;77:9;78:15
**either (6)**
19:10,23;21:2;
49:4;57:13;65:11
**elderly (1)**
38:7
**electronic (1)**
82:3
**else (9)**

33:19;40:9;43:15;
49:21;56:6,13;
62:16;65:13;81:15
**e-mail (12)**
6:16,18,20,24;7:1,
3,8;69:10,11;74:8,
14,19
**e-mailed (1)**
13:13
**e-mails (2)**
69:12,22
**employee (8)**
13:3,9,10;23:22;
46:14,25;55:24;79:4
**employees (1)**
13:5
**end (7)**
10:12;14:11;
56:21,22;57:1,3;58:9
**engage (1)**
23:4
**enough (1)**
57:23
**Entertainment (1)**
67:7
**entire (6)**
11:22;21:1;34:18,
24;53:8,12
**entitled (2)**
50:20;74:9
**entrance (1)**
21:3
**erase (1)**
6:13
**erased (1)**
6:11
**errata (1)**
82:18
**essentially (2)**
25:5;41:18
**estate (3)**
22:24;67:13,14
**Evans (1)**
5:7
**even (1)**
51:7
**event (1)**
25:21
**everybody (2)**
21:6;57:24
**everyone (1)**
38:25
**EXAMINATION (3)**
4:15;75:17;80:23
**examined (1)**

4:6
**except (1)**
4:11
**excess (3)**
28:10,14;41:1
**excluding (1)**
33:20
**exists (1)**
78:8
**expect (2)**
71:12;72:7
**expectations (1)**
62:2
**experience (2)**
17:17;18:8
**Explain (1)**
57:22
**expound (1)**
76:24
**extent (2)**
56:20;70:7
**eyes (2)**
51:2;75:7

**F**

**fact (3)**
19:23;47:25;77:3
**factious (1)**
13:4
**factor (1)**
28:2
**fair (6)**
14:13;24:14;
41:19;61:9;62:13;
63:1
**far (2)**
46:6;78:11
**Farrell (1)**
66:4
**February (1)**
72:17
**Federal (1)**
82:21
**few (5)**
37:14;48:6;52:14;
53:16;75:15
**figure (5)**
17:22;18:7;21:25;
58:25;73:13
**figures (1)**
73:24
**file (1)**
11:7
**filed (2)**

78:22,24
**fill (2)**
28:18;63:2
**filled (1)**
29:5
**final (1)**
33:7
**finance (1)**
10:23
**Financial (1)**
63:11
**find (3)**
40:9;49:3;58:11
**finish (1)**
52:11
**fired (4)**
13:10;23:23,24;
24:3
**first (10)**
4:6;9:19;10:3,5,
14;11:1;12:16;15:2;
16:5;72:19
**five (2)**
35:17;48:4
**flagged (2)**
15:19,22
**floating (1)**
46:7
**following (1)**
60:10
**follows (1)**
4:7
**forgive (2)**
4:22;71:8
**form (17)**
4:11;17:18,19;
21:8;35:20,20;
39:15;48:9;60:24;
61:22;62:7,18;63:3;
64:9,12;68:11;80:18
**formal (1)**
7:5
**former (2)**
28:22;41:22
**forth (2)**
69:20,23
**forward (2)**
13:15,19
**four (7)**
11:3;26:4;27:13,
15,17;28:7;53:23
**FRAILS (41)**
4:14;6:1;11:25;
13:14,18;17:18;
19:17;21:8;35:9;

39:15;48:9;50:8,14,
16,22;51:10;52:4,5,
8,21;53:10;60:24;
61:21;62:6,17;63:3;
64:4,6,12;75:5,11,
15,18;80:6,9,11,19;
81:24;82:5,8,10
**Frances (1)**
10:4
**friend (1)**
54:6
**front (3)**
12:3,8;30:16
**full (1)**
20:16
**full-blown (1)**
73:22
**furnished (4)**
45:17;46:15,16,17
**further (3)**
23:12;80:19;81:24

# G

**gap (5)**
62:24;63:1,2,15,18
**gate (15)**
15:25;16:6,23;
19:8,11,21,23;20:24;
21:2;22:4,5;42:5,14,
25;49:18
**gave (14)**
25:17;28:3,12;
30:23;31:21,22,23;
41:6;52:24;70:5,6;
73:13;79:10,11
**Georgia (2)**
4:4;5:7
**Gerald (2)**
7:6,7
**gets (1)**
74:18
**G-i-b-b (1)**
54:17
**Giddens (1)**
54:15
**G-i-d-d-e-n-s (1)**
54:17
**girls (1)**
9:8
**given (6)**
7:14;30:20;31:8;
32:16;33:5;36:16
**giving (6)**
33:7;36:10;50:14;

52:3;56:12,13
**goals (1)**
62:2
**Godfrey (1)**
54:19
**goes (7)**
17:6,7;23:22;
39:10;42:13;71:14;
74:19
**Golf (1)**
4:9
**good (4)**
6:2;40:10;41:7;
74:12
**gosh (1)**
79:23
**Grace (4)**
66:6,8,24;67:1
**grade (1)**
63:7
**grandchildren (1)**
9:12
**Grandkids (3)**
54:24,25;55:2
**great-grandchildren (1)**
9:16
**grow (1)**
10:7
**guess (7)**
11:20;12:4;18:14;
27:2;47:17;71:7;
79:23
**guessing (2)**
15:5;68:3
**guy (2)**
47:10;54:13

# H

**half (5)**
17:15;43:1,2,5;
72:13
**hand (3)**
25:19;44:2;60:7
**handled (2)**
58:4,4
**hands (1)**
75:23
**handwriting (1)**
50:11
**handwritten (6)**
35:18,19;36:1,3;
45:2;81:1
**happen (4)**
43:15;45:1;72:8;

76:4
**happened (8)**
15:14;19:12;
20:20;22:10,16;
42:3;46:13;79:3
**happens (1)**
76:6
**hear (8)**
13:17;19:17;27:8;
33:16;43:12,17;
54:19;81:13
**heard (3)**
16:2;18:18;19:2
**hearing (2)**
4:21,23
**heated (2)**
60:14,17
**Heather (2)**
46:24;79:5
**heating (1)**
60:12
**heats (2)**
37:16;60:3
**heavy (1)**
74:21
**help (1)**
58:11
**Hey (1)**
61:6
**high (2)**
40:19;70:7
**highlight (10)**
12:16;14:3,11;
15:11;33:21;36:20;
37:18;41:13;43:20;
44:7
**highlighted (20)**
12:9,14,15,22,23;
13:24;14:2,10;
23:14;29:8,19;33:19,
25;34:3;36:12,17;
49:20;53:5,10;75:10
**highlights (3)**
13:22;34:8;53:13
**Hill (1)**
53:20
**himself (1)**
63:21
**hinders (1)**
71:16
**hit (2)**
72:13,16
**hold (1)**
80:6
**holders (3)**

76:16,19,23
**home (3)**
24:7,7;54:7
**Homeowners (3)**
53:21,25;54:13
**honestly (2)**
22:21;61:4
**honor (5)**
76:6,8,8,12,19
**honored (1)**
41:8
**hope (2)**
71:13;76:6
**hot (1)**
74:20
**Hotmail (2)**
7:1,3
**HOTTLE (22)**
4:5,9,17;5:3,5;
8:15,17,17,19,20,22;
9:9;50:12,17;51:4;
73:23;74:22;75:13,
15;80:11;82:8,11
**Hottle's (1)**
51:2
**hours (1)**
47:9
**houses (1)**
26:13
**husband (1)**
55:4

# I

**Ian (55)**
11:20,21;14:16,18,
21,24;15:2,18;16:4,
6,8,11,14,19;19:7,
20;20:4,7,11;21:16,
21;22:1;23:18;37:2;
41:7,17;42:19,24;
43:6;44:17,23;
45:21;46:4,5;49:20;
56:18;57:5,8,16,19,
24,25;58:13;64:22;
65:3,8,16,20;68:22,
25;69:10,16,24;70:9;
79:17
**Ian's (2)**
47:20;48:20
**idea (2)**
16:20;49:2
**imagine (1)**
15:1
**immediately (1)**

37:11
**impair (1)**
  8:9
**important (1)**
  53:19
**income (1)**
  56:4
**incomplete (1)**
  14:1
**indicated (1)**
  76:1
**indicating (1)**
  45:16
**individual (2)**
  20:18;26:23
**industry (1)**
  63:11
**information (9)**
  7:18;12:9;18:20;
  31:22;35:25;53:18;
  67:23;68:7;77:25
**In-laws (1)**
  8:23
**inside (1)**
  24:12
**inspection (1)**
  42:18
**inspections (1)**
  43:5
**instruct (1)**
  45:5
**into (2)**
  21:3;26:9
**investigation (1)**
  17:7
**Investment (1)**
  63:12
**Investments (1)**
  66:1
**invoices (1)**
  59:12
**involved (2)**
  28:25;80:2
**isn't (4)**
  17:12;18:13;
  47:24;63:1
**issue (2)**
  25:14;29:4

## J

**Jack (33)**
  11:20;14:17,19,22,
  24;15:3;16:4;20:7;
  23:18;37:2,7;41:18;

42:19;44:17;49:20;
56:18;57:5,8,16,20,
25;58:13;64:22;
65:3,8,16,20;68:22;
69:10,24;70:10;
77:10;79:17
**Jacks (1)**
  51:7
**Jack's (5)**
  11:21;19:8,20;
  20:4;69:16
**JAM (1)**
  66:1
**James (3)**
  9:22,24;10:1
**J-a-m-e-s (1)**
  9:24
**Jane (1)**
  9:23
**January (3)**
  59:23;72:16;74:21
**Jeff (3)**
  68:4,7,13
**JERRY (11)**
  4:5,8;5:5;7:5,7;
  14:5,10;17:19;30:3;
  34:12,12
**JerryH9937@bellsouthnet (1)**
  6:22
**Jerry's (1)**
  29:24
**Jessie (2)**
  66:4,6
**job (2)**
  58:7;61:15
**jobs (1)**
  10:22
**Joe (107)**
  4:10;5:9,9;6:7,15,
  19,23;11:16;14:14,
  17,22;15:7,15;16:3,
  9,18;18:23;19:5;
  21:17,21;22:2,19;
  23:10;24:3,5,16,16,
  18;25:14;26:1,2,3,8,
  17;27:20;28:12;
  29:9;30:9,11,13,23;
  31:14,17,21,25;
  32:11;34:12,13;
  37:22;38:1,23;39:3,
  19;40:7,20;41:18,20,
  22,25;44:24;47:11;
  49:15;50:6,19;55:6,
  10,16;56:7,14,16;
  57:11,15,18;58:1,11,

12;59:10;61:10,14,
18;62:4,15,19;63:1,
16,17,25;64:1,1,7,
16;65:14,24;68:21;
69:2,16;70:1,9,14,
17,23;71:17;73:9;
78:17;81:1,6,10
**Joe's (14)**
  23:22;24:8,13;
  25:8,9;27:23;30:1,4;
  33:17;46:25;63:6;
  79:4;81:8,13
**John (2)**
  64:13;67:23
**Jr (4)**
  66:6,8,24;67:1
**Judicial (1)**
  4:3
**jumped (1)**
  43:25

## K

**keep (14)**
  12:8;31:11;40:11;
  51:13;59:22;67:16,
  18,21,23,24;68:5,16;
  69:12;81:20
**kept (5)**
  35:25;47:10;68:1,
  2,3
**kids (1)**
  54:22
**Kid's (1)**
  54:25
**kind (4)**
  13:25;45:16;
  61:19;71:2
**knew (5)**
  32:2;38:24,25;
  41:18,18
**knowledge (8)**
  7:4;15:24;19:9;
  41:22;58:3;78:15,
  18;80:1
**knows (1)**
  79:5
**Kyle (2)**
  9:14;55:1

## L

**last (20)**
  6:11;8:15,17,21,
  24;10:17,25;29:24,

24;44:11;45:11,12;
53:23;54:16;61:8;
70:1;73:2,21;74:2,10
**lawsuit (6)**
  11:9;70:10,14,15;
  78:22,23
**lawsuits (1)**
  38:22
**lawyers (1)**
  51:6
**lays (1)**
  77:2
**learn (2)**
  20:20,22
**learned (3)**
  16:24;19:24;42:8
**least (2)**
  17:15;60:8
**leave (1)**
  81:17
**left (3)**
  23:23;29:11,14
**less (1)**
  48:23
**license (1)**
  39:11
**line (17)**
  12:19,20;13:25;
  15:12;29:21,22;
  33:20,24;36:22,23,
  24,25,25,25;41:16;
  44:9,10
**lines (3)**
  12:21;34:3;44:5
**list (83)**
  30:4,8,9,10,13;
  31:10,11;32:1,2,4,4,
  18,24;33:4,7,7,11,
  17;34:14,14,15,16,
  19,21,23,24,25;35:1,
  2,6;36:5,8;40:11;
  45:15,16,18;46:6,9,
  15,15,17,20;47:16,
  19,21,22,24,25;48:1,
  3,17,18,23,25;49:7;
  50:23,23;67:21;77:8,
  12,12,12,14,17,22;
  78:2,5,8,8,11,16,17,
  23;79:1,14;80:25,25;
  81:1,4,7,11,14,17
**little (7)**
  7:12;15:5;17:11;
  24:9;45:20;63:25;
  79:2
**live (4)**

9:4,13;43:17;54:1
**lived (1)**
  5:8
**living (1)**
  10:20
**LLC (10)**
  66:4,6,8,14,18,20,
  24;67:1,3,5
**long (5)**
  5:16,22,23;39:7;
  63:8
**longer (1)**
  32:7
**look (8)**
  11:18,24;47:15;
  49:21,24;53:4,5,10
**looked (3)**
  11:21;29:10;75:12
**looking (3)**
  19:13;23:1;49:19
**looks (1)**
  40:15
**Lord (1)**
  79:5
**lose (2)**
  45:22,23
**lost (9)**
  38:11;39:5;45:21,
  21;46:19;59:6;61:6,
  6;79:12
**lot (5)**
  13:4;17:12;18:4;
  32:5;71:12
**low (2)**
  26:23,24

## M

**maiden (3)**
  9:18,24;10:1
**makes (2)**
  42:16;44:5
**making (1)**
  44:19
**managed (1)**
  31:6
**Management (1)**
  67:5
**many (29)**
  9:6;12:6;18:8,18,
  21;19:3,5;27:13;
  34:25;35:1,16,21;
  37:14;41:5;43:9,11;
  44:1;54:8;57:21;
  58:24;59:10,23;

61:8;70:22;71:5;
73:2,12;74:12;75:19
**March (2)**
72:19;76:2
**marked (2)**
12:10,13
**marketplace (1)**
58:19
**married (2)**
54:10,25
**Master (1)**
39:14
**Masters (53)**
14:14;15:7,14,23;
17:8;19:24;21:6;
22:22,25;23:4,25;
32:10,22,25;33:8,12;
37:3,4,8,11;39:8;
40:14;50:5,20;51:11,
18;55:9;56:14,22;
57:2,3,6,9,16,20;
58:1,17;59:19;60:2,
9;61:15;64:23;65:3,
5;67:10;69:10,15;
70:18,20,24;73:4,17,
22
**math (3)**
27:18;40:16,18
**Mathis (6)**
9:11,14,15;54:22,
23;55:3
**may (6)**
30:21;52:14;
54:12;65:23;71:25;
80:9
**maybe (4)**
7:15;8:5;15:5;
77:18
**mean (11)**
7:17;11:17;16:18;
57:22;58:20;61:5;
68:1,24;72:16;
76:24;77:5
**meaning (1)**
47:17
**means (1)**
51:4
**medications (3)**
7:21;8:2,7
**meet (2)**
24:7;62:2
**Melanie (1)**
54:19
**member (1)**
47:1

**memory (1)**
27:1
**mention (3)**
23:15;53:13;57:18
**mentioned (3)**
45:22;46:21;75:21
**merges (1)**
11:3
**mess (1)**
73:18
**met (2)**
15:2,6
**microphone (1)**
4:20
**might (4)**
4:18,20;7:16;
53:17
**mind (4)**
8:1;50:14;52:3;
82:7
**Mine (4)**
27:19;45:18;
50:11;63:7
**minimum (1)**
60:6
**minority (1)**
60:6
**minute (5)**
13:14,18;20:15;
52:9;73:3
**misstatement (1)**
82:14
**moment (2)**
70:19;80:6
**money (12)**
24:17;39:4,21,25;
40:1,2;62:5;64:16;
71:1;72:15;75:23;
76:1
**month (1)**
59:25
**monthly (1)**
61:5
**more (16)**
6:14;18:12,15;
25:20;28:6,19;29:8;
35:23;38:19;43:13;
46:24;52:13,14;71:7,
12,13
**Morgan (3)**
9:15;55:1;66:8
**morning (3)**
8:4,4;41:23
**most (2)**
68:1,2

**mostly (1)**
8:3
**move (2)**
10:14;64:19
**much (3)**
26:16,17;55:20
**Mullins (46)**
4:10;5:9;6:7,15,
19,24;11:16;13:3,6;
14:8,14,17,22;15:7;
16:4;18:24;21:17,
21;22:2,19;32:11;
36:7;41:20;47:11,
19;49:15;50:6,19;
55:6;56:7;65:14,24;
66:10,12,14,16,18;
67:3,5,7,12,17;68:7,
21;69:16;81:1
**Mullins' (5)**
5:9;19:5;48:24;
51:5;68:4
**Mullins's (1)**
36:16
**myself (1)**
39:9

## N

**name (26)**
5:4;7:5,5;8:17;
9:10,18,24;10:1,3;
17:24;20:14,16,18;
21:6;22:8,10;29:24,
24;46:23,24;54:14,
16,18,21,25;79:5
**named (1)**
54:3
**names (20)**
8:15,21,24;20:12;
21:13;22:20,21,23;
23:6;34:19;46:15,
17;56:6,8;70:22;
77:13;78:12;79:6,
13;81:14
**National (45)**
15:20;16:24;
17:23;18:2,9,10,19,
22;21:5,13,20;22:1,
8,17;33:17;34:23;
38:11;39:1;40:18,19,
25;42:8,11;43:5,15;
45:17;46:18;47:2,
18;48:6,17;51:21;
69:2;72:11;74:8,14;
77:8,13,19;78:4,9,

12;79:8,10,11
**necessarily (2)**
13:1;33:6
**need (11)**
6:14;7:18;33:10;
51:23,24;52:1,12;
64:8;65:25;74:24;
80:7
**needed (2)**
28:15;31:8
**Needle (1)**
66:20
**needs (1)**
63:25
**negotiate (8)**
25:25;31:14;60:8,
9;71:17,18;72:4;
74:6
**negotiated (1)**
31:18
**negotiating (1)**
31:17
**neighbor (1)**
54:6
**neither (2)**
41:22,25
**never (12)**
28:24;31:5;34:12,
13;40:23;45:14;
48:1;61:24;62:9,22;
78:15,17
**new (3)**
32:8;72:24,25
**next (12)**
13:24;15:10;
23:14;29:18;33:21;
36:19;37:15,18;
41:13;43:20;44:7;
60:10
**nickname (1)**
7:7
**night (3)**
8:3;45:11,12
**No (119)**
5:11;6:10,25;7:2,
4;8:11;9:17,20;11:6,
8,12,23;12:14;13:7,
11,23;17:14;18:11;
19:4;21:15;22:6,18;
23:11,20;24:1;25:1,
10;26:2,15;29:13;
30:3,7,8;32:6,7,20;
33:8,14,18;34:9,12,
14,23;35:7;36:10,13,
15;37:6;38:4;39:12;

40:23;41:4;43:19;
44:5,7;45:7,17;46:9,
12;47:16,22;48:1,16;
49:2;50:2;51:16;
53:22;55:8,11,15;
56:2,5;57:7;58:14,
16;59:22;65:15,21;
66:3,5,7,9,11,13,15,
17,19,21,23,25;67:2,
4,6,15;68:1;69:6,11,
14,21,25;70:11,16;
71:1,7;72:18,25;
73:15;76:10;77:12,
21;78:6,11,19,21;
79:1,19;80:14;81:15,
19
**None (2)**
58:19;78:13
**normal (1)**
71:11
**Northeast (1)**
20:13
**note (12)**
44:15,20;45:1,2,5,
8,13,14,19;46:3;
47:16,16
**notebook (3)**
51:10;73:25;75:6
**notes (12)**
12:11;13:22;
44:13,14;45:7,11,13;
47:13;50:7;51:14,
24;52:2
**November (8)**
37:16;60:4,4,12,
13,16,18;71:10
**number (18)**
5:14,16;12:5;17:3;
35:7,12;36:8;40:24;
41:7;42:22;43:24;
49:6;61:11,25;62:10,
14;63:15,16
**numbered (1)**
12:1
**numbers (5)**
30:21,23;31:4;
36:4;48:13

## O

**Object (13)**
17:18;21:8;39:15;
48:9;60:24;61:21;
62:6,17;63:3;64:4,9,
12;80:17

objecting (1)
17:19
objection (4)
62:21;63:5;64:9,
11
objections (1)
4:11
obligated (2)
61:19;64:17
obligation (5)
61:25;62:4;64:2,
18;68:5
Obtaining (2)
37:24,25
occasion (2)
76:11;77:4
Occasionally (1)
6:17
occasions (1)
76:18
occur (3)
41:23;73:4,19
occurred (6)
21:3;22:4;31:1;
73:7;80:2,4
occurring (1)
16:7
OCGA (1)
82:22
off (6)
4:25;38:8;52:18,
19;53:17;77:20
offer (2)
42:2;64:5
offhand (1)
43:9
office (17)
23:23;24:5,8,13;
25:8,9;26:9,10;
27:23;29:10;32:12,
13;56:11;81:8,10,13,
15
official (2)
46:15,16
okayed (1)
31:18
old (3)
54:6;77:5;81:22
once (1)
74:10
one (24)
4:22;7:15,20;8:6;
12:18;20:11,12,13,
15;30:10;32:6;36:9,
10;38:6;39:18;

43:25;57:14;60:7;
65:12;67:9;79:14;
80:6,21;81:15
ones (8)
15:18;20:24;32:6,
8;37:21;49:15;
57:24;58:12
ongoing (1)
61:5
only (18)
8:19;10:6;24:9,12;
30:10;46:19;48:24;
49:1,11,14;51:2,5;
59:5,14;65:1;75:7;
81:6;82:3
operated (1)
65:24
opinion (8)
22:12,15;31:5;
42:2;64:3,5;77:1;
79:9
orally (1)
68:11
order (2)
76:15;82:2
others (3)
4:10;69:7;70:7
out (22)
10:16;11:25;
17:23;18:7;21:25;
25:13;26:13;27:19;
28:18;29:5;47:18;
49:3;59:13;60:5;
61:15;63:17;68:1,2;
72:12;74:8,19;77:2
outside (1)
81:17
over (13)
9:3,13,16;13:5;
45:14;46:1;50:15;
51:15;53:4;71:25;
78:15,17,23
own (2)
17:13,16
owned (7)
5:9;16:22;31:15;
38:15;39:4;42:9;
65:24
owner (7)
21:20;27:5,7,11,
13,15;56:24
owners (4)
56:16;67:20;72:7,
19
owner's (1)

72:3
owns (1)
17:3

**P**

page (26)
12:5,7,7,18;13:21,
25;23:13;29:7,8,20;
33:19,22;35:21;
36:19;37:17;41:11,
12;43:24;44:11,15;
46:3;47:15,17;77:19,
20;79:14
pages (17)
11:24;12:1,6,9,11;
13:13;35:16,24;44:1,
13;47:14;48:4,7;
49:19,20;50:1;79:13
paid (12)
27:5,7,11;56:16;
61:18;64:16;65:17;
67:17,18,20;68:8;
76:19
Palmer (1)
5:7
Pamela (1)
9:11
paper (2)
17:11;68:16
paperwork (1)
28:19
Pardon (4)
27:6;49:13;63:23;
67:22
part (6)
28:25;29:18;31:6;
46:5;48:24;49:1
partial (2)
48:23;49:7;77:12
parties (1)
76:8
party (1)
11:9
past (3)
11:15;25:3;72:22
Patricia (1)
54:10
Pause (1)
5:1
pay (13)
24:11,20;28:15;
31:14,17;39:3,4;
55:16,20,22,24;63:7;
76:15

payment (1)
72:7
Pennsylvania (2)
8:12;10:8
people (59)
7:12;17:8,13,16;
18:1,4,8,23,23;
19:19;20:6,8,11;
22:24;24:8,10,11,24;
25:2;26:10;28:3,4,6;
31:15,21;34:19,25;
35:1;37:11;38:11,
14;39:3;42:9;43:10;
45:24;48:21;54:12;
60:6;63:21,24;
71:14;72:14,15,20,
22,24;73:2;74:2,5,8,
10,14,16;76:11;
78:16;79:6;80:2;
81:11,14
people's (1)
26:13
per (5)
27:3,4,10;35:21;
56:3
percent (6)
18:12,15;24:6,8;
40:17;43:14
percentage (2)
24:24;40:20
percentages (1)
40:23
perhaps (3)
37:16;59:2;79:24
period (2)
11:3;49:7
person (16)
16:22;17:4,6,8;
22:8,9;24:20,23;
26:3;27:22,25;
34:11;46:22;47:8;
54:3;56:17
personal (2)
7:17;32:13
personally (1)
11:10
perspiration (1)
9:2
Phil (2)
20:11,12
Phillip (2)
55:1,3
phone (7)
5:12,14,23,25;6:4,
7;72:14

pick (7)
4:21;25:8,11;26:6,
14;47:19,21
picked (2)
57:13;65:11
picking (1)
64:25
Pine (1)
66:20
place (3)
5:8;15:10;25:16
please (1)
5:3
pm (3)
80:10,10;82:20
point (2)
31:18;71:1
pointing (1)
5:24
pop-up (1)
6:1
portfolio (1)
38:7
portion (2)
23:14;25:21
portions (2)
53:6,11
position (1)
29:2
possession (4)
30:18;31:12;
32:14;77:15
possible (1)
47:23
possibly (1)
77:8
Potter (1)
20:19
practice (3)
14:5,21;67:16
preparation (3)
49:21,25;52:20
prepare (1)
25:24
preprinted (2)
35:19,20
presence (1)
81:18
presented (1)
21:14
presenting (2)
16:23;17:8
presents (1)
77:4
president (1)

53:23
**presume (2)**
28:9;36:14
**previous (1)**
32:1
**price (14)**
25:25;26:4,20;
31:14,19;67:17,18;
68:8;70:6,7;71:16,
16,23,24
**prices (1)**
71:19
**prior (6)**
32:24;33:8,12;
42:4;65:6,8
**privy (1)**
18:20
**Probably (16)**
15:4;18:15;24:9;
35:23,23;39:9;40:9;
48:7;52:13,15;
53:14;54:8;59:19;
63:10;64:24;71:25
**problem (5)**
37:23,25;45:24;
65:19;68:23
**problems (4)**
37:21;57:4;68:22;
69:16
**Procedure (1)**
82:22
**proceedings (1)**
5:1
**process (2)**
42:6;71:18
**processes (1)**
17:2
**programs (1)**
29:1
**promise (1)**
76:5
**promised (1)**
71:5
**promises (5)**
71:2,9,22;72:21;
75:20
**pronounce (1)**
8:18
**Properties (4)**
66:10,12,14,16
**Property (1)**
66:18
**provide (2)**
62:4;76:12
**provider (2)**

5:18,22
**public (1)**
51:20
**pulled (1)**
11:25
**purchase (2)**
38:9;77:5
**purchased (5)**
11:2;32:12;35:5,8;
45:23
**pursuant (2)**
4:1;82:21
**put (7)**
13:22;17:11;23:9;
45:1,5;47:13;51:1

**Q**

**question (30)**
4:12;15:4,16,17;
16:16;17:20,21;21:9,
10,17,24;32:23;33:9;
34:2;39:16;41:2,21;
48:10,22;58:6,20;
60:25;61:11,22;62:7,
18;63:13,14;64:13;
78:3
**questioned (1)**
39:9
**questions (12)**
7:17;8:9;17:5;
52:13,15;53:16;
65:23;68:19;75:3,
16;80:20;81:25
**quick (2)**
40:16;65:23
**Quint (1)**
20:15
**Q-u-i-n-t (1)**
20:15
**quite (2)**
18:1;33:9
**quote/unquote (5)**
33:8;45:15;46:6,
20;73:21
**quoted (1)**
44:19

**R**

**radio (2)**
47:4,8
**Ranch (1)**
66:20
**random (5)**

42:7,18,20;43:5,8
**randomly (2)**
42:5,11
**Randy (8)**
4:13;11:19;13:12,
16;47:7;64:9;75:10,
14
**range (9)**
26:18,19,22,22,24,
25;27:10;71:23,24
**raw (1)**
40:24
**read (8)**
53:4,7,12;74:23,
25;82:7,8,11
**ready (1)**
11:14
**real (5)**
4:21;22:23;65:22;
67:13,13
**realize (1)**
60:23
**really (6)**
27:1;56:9,9,20;
60:25;61:11,22;62:7,
79:19;82:15
**re-ask (1)**
21:11
**reason (8)**
19:11;20:25;21:1;
22:13;31:5;32:7;
59:8;65:1
**recall (28)**
13:10;16:9,14;
23:17,20,24;28:21;
29:11;30:6;31:20;
33:7;36:10;37:6;
38:4,24;43:9;44:17;
53:2,14;60:20;65:2,
7,17,19;69:5;72:24;
78:25;79:19
**receive (2)**
65:16;74:9
**received (3)**
6:6;43:10;67:24
**Recess (1)**
80:10
**record (14)**
4:25;5:2,4;36:3;
51:1;52:15,18,19;
58:2;59:22,25;66:1;
68:13;75:4
**records (5)**
17:24;59:20;
67:25;68:2,16
**reduced (2)**

38:5,6
**refer (2)**
51:15;82:18
**referenced (1)**
79:15
**referring (3)**
14:14;50:18;79:21
**refers (2)**
15:13;37:20
**regardless (2)**
48:2,13
**Regulations (1)**
4:2
**related (6)**
8:14;16:7;22:22,
23;24:2;55:6
**relates (1)**
23:25
**relating (1)**
22:24
**relationship (1)**
41:20
**relative (1)**
43:10
**relatives (1)**
8:20
**remember (5)**
20:12;22:21;23:8;
46:22;65:9
**rephrase (1)**
61:12
**replacement (1)**
58:12
**report (1)**
56:3
**Reporter (2)**
4:1;82:1
**Reporting (1)**
4:3
**requests (1)**
81:6
**require (1)**
28:18
**resell (1)**
77:3
**reserve (1)**
4:10
**reserved (1)**
82:24
**response (1)**
78:21
**responsibility (1)**
64:18
**responsiveness (1)**
4:12

**rest (2)**
29:7;59:9
**restate (1)**
77:4
**result (2)**
43:4;79:12
**retired (2)**
10:21;11:4
**return (1)**
26:8
**returned (2)**
41:8;45:25
**reviewed (2)**
11:15,17
**Rhodes (6)**
46:17;47:1,3,4;
79:9,11
**rid (1)**
68:17
**right (69)**
9:25;11:4;12:21;
14:25;15:20;16:8;
18:2,5;21:21;22:11;
25:6;27:17,18;28:1,
4,7,8,10,13,16,17;
29:5,12,16,17,23;
31:12;33:1;34:7;
36:17;37:12,17;
38:11;39:21;40:4,11,
18;43:21;48:3,4,8,
14,22,24;49:11,17;
51:13;54:22;58:22;
60:2,5,12,18;61:16,
17,20;62:16;63:2,18,
22;64:17;69:13;
73:7,10;74:19,22,25;
81:2;82:5
**right-hand (1)**
12:4
**risk (4)**
38:25;76:23,25;
77:2
**risks (1)**
77:6
**role (1)**
24:6
**roughly (5)**
35:16,17;55:20;
59:24;73:12
**round (2)**
14:5,21
**rude (1)**
4:20
**Rule (1)**
82:21

**Rules (4)**
4:2;51:18,22;
82:22
**rumor (1)**
33:16
**rumored (1)**
80:1
**runner (3)**
14:4,8,14

## S

**same (7)**
7:11;26:20;61:11;
69:7,22;72:21;77:20
**saying (4)**
30:13;34:11;
41:24;47:10
**scan (2)**
42:13,14
**scanned (1)**
19:9
**scanning (1)**
42:6
**second (1)**
52:18
**secretaries (1)**
23:2
**secure (8)**
24:9;30:11;32:9;
60:3;61:15;62:1;
63:17;76:15
**secured (9)**
16:17;32:7;56:15;
58:5;62:23;71:9;
73:3;74:1;79:6
**securing (2)**
37:15;71:16
**seeing (2)**
17:10;65:9
**seem (3)**
7:17;44:1;53:17
**sell (3)**
24:16;26:4;59:10
**sellers (3)**
40:5;56:12;76:23
**selling (8)**
15:7;26:16;39:8,
13,19;40:14;58:4;
70:18
**send (7)**
50:15;51:12;56:1;
72:11;75:6,9;82:7
**sends (3)**
59:13;74:8,14

**sense (4)**
14:1;42:16;44:6;
50:10
**sent (3)**
6:3,6;75:11
**sentence (1)**
14:1
**series (1)**
65:22
**set (2)**
25:23
**several (2)**
53:8;71:25
**shared (1)**
11:19
**sheet (1)**
82:18
**short-term (1)**
10:22
**Show (2)**
47:4,7
**showing (1)**
36:8
**side (3)**
32:8;58:4,4
**sign (3)**
74:24;75:1;82:7
**signature (1)**
82:23
**sister-in-law (2)**
9:20,21
**sit (1)**
32:17
**six (2)**
35:23;48:4
**size (1)**
48:2
**Sloan (1)**
20:13
**slowed (1)**
71:18
**small (1)**
25:21
**sold (16)**
16:4,18,18;18:2;
30:12;40:20;42:24;
58:7;61:10,14;62:4,
10,15,23;63:17;73:9
**somebody (12)**
15:13;23:23;
24:15;28:15;29:9,
14;30:1;33:16;
62:16;64:1,16;81:13
**someone (4)**
25:22;30:3;34:5;

40:9
**Sometimes (4)**
7:10;25:20;60:11,
11
**somewhat (1)**
38:7
**somewhere (5)**
20:10;36:1;42:23;
58:25;76:2
**son (1)**
9:9
**sophisticated (1)**
17:2
**sorry (17)**
5:24;9:21;13:8,16;
14:7;27:8;32:21;
36:24;37:5;47:5;
49:23;53:9;54:17,
24;59:17,17;73:6
**sort (1)**
14:8
**sorts (1)**
29:25
**source (1)**
25:5
**SouthTrust (1)**
11:2
**SPARKS (52)**
4:8,16,25;5:2,3;
6:3;13:12,16,20,21;
17:22;19:16,18,25;
21:10,12;35:10;
39:17,20;47:8;48:11,
12;50:17,25;51:4;
52:7,10,18,20;61:1,
2,23;62:3,8,13,20,
25;63:4,8;64:5,8,14;
75:9,12,19;80:8,17,
21,24;81:23;82:3,6
**speak (4)**
4:18;47:25;64:20,
22
**speaking (1)**
64:8
**special (1)**
34:23
**Specif (1)**
70:11
**specific (5)**
25:18,20;34:17;
57:24;61:25
**specifically (7)**
8:6;13:7;16:3;
53:3,15;61:4;69:23
**speculation (2)**

42:13;46:5
**spelled (1)**
29:25
**spoke (1)**
14:24
**Sports (1)**
67:7
**staff (2)**
29:1,1
**stamp (1)**
17:2
**stamped (1)**
75:6
**start (4)**
37:11;60:3,11,11
**started (2)**
16:5;65:5
**starts (2)**
33:2;37:15
**state (2)**
5:3;17:21
**stated (2)**
42:4;60:10
**statement (4)**
41:17;44:18,25;
45:3
**stayed (2)**
10:18,19
**stemmed (1)**
56:17
**stepped (1)**
53:9
**still (3)**
23:10;53:20;70:17
**story (2)**
23:17,21
**Straight (1)**
5:19,20
**street (2)**
72:13;79:25
**subject (6)**
41:21;50:23;
62:20;63:4;64:11;
75:3
**suggest (2)**
4:10;52:10
**supplied (3)**
79:7,8,9
**suppliers (2)**
30:12;63:20
**supply (1)**
38:4
**suppose (1)**
14:24
**supposed (1)**

57:5
**sure (9)**
9:25;37:9;52:10,
12;53:7,18;69:4;
75:4;80:8
**surfaced (1)**
46:20
**Susan (1)**
54:15
**Sweat (2)**
8:25;9:1,2,18
**sworn (1)**
4:6

## T

**Talk (23)**
5:19,20;11:13;
14:3;37:2,7;38:14;
47:8;51:1;52:21,23;
68:21;69:2,9,16;
70:3,4;71:21;74:6,
12,15;81:10,15
**talked (5)**
16:11;70:1,4,9,14
**talking (9)**
13:6;23:18;34:16,
18,18,20,21;50:1;
51:14
**talks (1)**
29:23
**tally (1)**
71:6
**Tameka (1)**
80:7
**tax (1)**
56:4
**technology (1)**
7:12
**television (1)**
47:3
**telling (4)**
8:1;30:6;44:17;
70:22
**ten (1)**
54:8
**terrible (3)**
21:10,17;61:11
**testified (8)**
4:7;22:7;34:15;
62:19;76:22;77:9;
78:14;79:20
**testify (1)**
33:11
**testimony (5)**

43:2,4;60:4;77:7,
18
**testing (1)**
27:1
**texts (7)**
6:3,6,7,9,12;69:12,
19
**thoroughly (1)**
21:23
**though (3)**
14:13;16:12;23:6
**thought (1)**
77:9
**threaten (1)**
38:22
**three (3)**
11:3;47:9;53:23
**Thursday (3)**
33:1,13;41:24
**ticket (5)**
17:4,9;42:13,15;
71:15
**tickets (27)**
14:5,16,17,18,21,
25;15:7;17:2;25:16;
30:1,4;34:20;39:2;
41:6;42:5,6,8,11,18,
22,24;43:1;56:12;
64:25;65:2;69:17;
72:13
**times (3)**
28:10;53:8;76:14
**today (2)**
7:21;32:17
**today's (1)**
11:14
**told (17)**
14:6;17:25;23:17;
30:3,7;31:20,24;
34:6,11,12,13,13;
53:3,4,12;60:13;
64:21
**took (1)**
14:25
**Top (3)**
12:4;43:24;44:3
**Total (4)**
20:13;45:21;49:8;
62:14
**tough (1)**
15:4
**tournament (6)**
21:3,4;46:1;58:9;
65:6,8
**Townhome (2)**

53:20,21
**transacted (1)**
71:1
**transaction (2)**
25:24;28:19
**transcript (2)**
74:23;82:2
**Travel (2)**
4:9;20:13
**trouble (2)**
17:10;38:2
**true (3)**
17:12;18:6;45:4
**truthful (1)**
80:15
**truthfully (1)**
8:10
**try (1)**
64:10
**trying (4)**
17:22;18:7;21:25;
49:2
**turn (3)**
46:18;70:6;78:23
**turned (9)**
30:1,4,12;33:16;
34:14,22;78:12,15,
17
**Twenty-eight (1)**
48:20
**Two (1)**
9:7
**Tylenol (1)**
8:5
**type (3)**
8:6;46:7;77:12
**typewritten (1)**
35:18

## U

**Uh-huh (1)**
39:22
**Under (3)**
51:18,21;61:24
**understood (1)**
53:7
**unequivocally (1)**
33:12
**unknown (1)**
25:22
**unless (1)**
6:13
**untruthful (1)**
80:13

**up (31)**
4:18,21;6:1;7:11;
10:7,12;14:5,10;
20:13;25:8,11,23;
26:6,14;37:16;43:7;
47:19,21;57:13;60:3,
12,14,17;63:25;
64:25;65:12,18;
67:16,18;71:15,18
**upon (2)**
24:22;77:17
**use (4)**
6:18;18:1,4;34:19
**used (3)**
17:13,16;41:7
**using (4)**
6:4,24;18:9;42:9
**usually (8)**
6:13;8:4,5;24:21;
25:23;37:15;72:16;
81:9

## V

**valid (1)**
42:15
**validated (1)**
56:24
**validation (1)**
74:11
**value (1)**
71:15
**various (1)**
62:11
**versus (3)**
4:9;24:25;62:23
**vitamins (1)**
8:5

## W

**Wachovia (1)**
11:2
**Wait (3)**
20:14,14;73:3
**waive (1)**
74:25
**wall (1)**
53:17
**way (8)**
12:10;13:12;23:9;
33:10;37:12;55:7;
74:13;78:8
**ways (1)**
29:25

**wear (1)**
4:24
**week (1)**
72:19
**weren't (8)**
16:22;22:5;26:20;
29:15;38:19;42:9;
60:21;61:3
**What's (5)**
5:6;10:25;34:2;
63:14;71:23
**whatsoever (1)**
45:25
**whenever (2)**
10:21;72:15
**whole (3)**
14:12;46:4;47:24
**Whose (2)**
19:1;20:8
**wife (4)**
9:19,22,23;10:5
**wife's (2)**
9:18;10:1
**Without (4)**
13:4;40:7;45:24;
70:22
**witness (11)**
4:9;17:21;19:20;
39:18;47:6;52:17;
61:24;62:9,22;63:6;
82:23
**wondering (1)**
70:14
**words (1)**
57:21
**work (7)**
23:10;24:5;67:12;
82:9,10
**worked (7)**
10:25;11:16;13:3,
5,9;24:7;56:7
**working (6)**
22:19;23:2;24:3;
39:7;40:13;55:9
**works (2)**
37:13;74:13
**Wow (2)**
10:7;72:20
**write (1)**
47:18
**written (1)**
68:10
**wrong (2)**
73:6;82:13

## Y

**Yahoo (2)**
7:9,11
**Yahoocom (1)**
7:9
**y'all (5)**
25:5;52:23;60:2;
70:3;76:15
**year (19)**
25:6;32:2,5,5;
37:15;46:14;55:21;
56:3;60:10,10;61:8;
71:14,20;72:12,25;
73:2,6;74:2;75:20
**years (13)**
5:17;7:15;10:6,23;
11:15;13:5;40:21,
22;53:24;54:8,9;
63:10;81:21
**Yes (68)**
5:13,21;6:5,8,17,
21;7:23,24;8:13;9:5;
12:2,11,24;13:14;
14:15,20;16:13;
18:14;22:23;25:4;
26:11,20;27:9,14;
28:2,5;29:6;31:18;
35:4;36:6;37:5,5;
38:2,16;39:23;40:2,
22;41:3;44:22;
45:10;47:9;50:13;
51:8;54:4,11;55:17,
19,25;58:23;64:16;
67:8,20;68:6,9,15;
71:3;72:23;73:8;
74:17;75:2,8;77:24;
78:10;80:5;81:12,
21;82:4,10
**Yesterday (1)**
70:2

## 1

**1 (1)**
66:10
**10 (3)**
18:12;29:22;66:16
**10,000 (3)**
28:6,14,20
**100 (2)**
24:8;47:16
**104 (2)**
36:21;37:17

**105 (3)**
   37:19;41:11,12
**106 (1)**
   47:17
**107 (4)**
   41:14,15,16;43:21
**109 (1)**
   5:7
**1099 (2)**
   55:24;56:1
**11 (2)**
   29:22;39:10
**12 (6)**
   13:25;14:3;29:22;
   33:20;36:25;39:10
**120 (3)**
   59:2,16,17
**13 (4)**
   13:25;14:4;33:20,
   24
**14 (2)**
   33:24;44:10
**14- (1)**
   27:25
**140 (4)**
   59:3,5,15;73:14
**15 (8)**
   5:17;12:20;15:5;
   33:24;36:25;46:12,
   12,13
**16 (5)**
   33:24;44:5,10;
   46:11;79:18
**16th (1)**
   71:10
**17 (5)**
   15:12;23:15;
   33:24;36:25;79:18
**18 (16)**
   9:3,13,16;12:20;
   14:8,17;15:12;
   23:15;24:3;33:24;
   37:1,19;44:10;59:3,
   5;79:18
**19 (4)**
   13:8;37:1,19;44:5
**198 (5)**
   43:22,23;44:4,4,5
**199 (1)**
   44:4

---

**2**

**2 (1)**
   66:12

---

**20 (6)**
   5:17;37:1;63:10;
   73:15,18,19
**200 (6)**
   47:20;60:22,22;
   61:14,15,18
**2000 (2)**
   60:16;73:3
**2011 (1)**
   39:10
**2013 (2)**
   35:7,9
**2015 (8)**
   46:6,12;79:3,4,14,
   17,18;80:4
**2017 (1)**
   56:7
**2018 (55)**
   13:8;14:13,22;
   15:14,20;16:15;
   18:19;19:6,7;21:6,
   14;22:19,25;23:24;
   26:18,22,25;27:2;
   30:4,24;32:10,22,24;
   33:12,17;35:3,10,11,
   12;36:8;37:3,4,11;
   38:11;40:16,18;
   41:24;46:6,10;50:5,
   19;51:11,17;55:18;
   58:21;60:16,20;
   67:24;68:22;69:10;
   77:8,14,23;78:5,17
**2019 (36)**
   37:8,12,21;38:1,3;
   41:5,9;50:5,19;
   51:11,17;55:18;57:6,
   9,12,16,20;58:1,11,
   13,17,24;59:10,15,
   24;60:22;61:14;
   64:22;65:3,8,17,20;
   69:15,17,24;79:15
**202 (3)**
   12:7;44:8,9
**2021 (1)**
   73:4
**2022 (1)**
   73:5
**2023 (4)**
   70:20,23;71:20;
   75:20
**21 (3)**
   29:9;37:1;73:19
**22 (7)**
   73:6,10,12,16,20,
   21;74:10

---

**22,000 (3)**
   27:16,21;28:1
**23 (4)**
   37:19;40:17;74:3,
   9
**25 (6)**
   37:19;71:7,10,22;
   72:20;75:21
**260 (9)**
   35:8,8,13,14,15;
   40:15;45:20;47:21;
   61:3
**260-something (1)**
   58:22
**28 (12)**
   19:7,20;21:16,20;
   22:1,11;42:18,22,24;
   45:21,23;47:20
**29 (1)**
   41:6

---

**3**

**3 (1)**
   66:14
**3,500 (2)**
   26:24;27:10
**30 (6)**
   43:13;71:7,10,22;
   72:20;75:21
**30e (1)**
   82:21
**31st (1)**
   74:14
**32 (8)**
   19:10,18,22;20:3,
   5;21:1;43:8;48:20
**35 (1)**
   7:15
**3rd (1)**
   74:21

---

**4**

**4,000 (1)**
   71:25
**40 (3)**
   10:23;35:23;43:13
**44 (1)**
   79:12

---

**5**

**5 (2)**
   29:22;41:16

---

**5,000 (2)**
   31:16,17
**5,500 (2)**
   27:2,10
**5:34 (1)**
   80:10
**5:36 (1)**
   80:10
**5:38 (1)**
   82:20
**50 (5)**
   18:15;24:6;35:22;
   43:13;81:21
**56 (1)**
   10:15
**58 (2)**
   10:17,20

---

**6**

**6 (1)**
   29:22
**6,000 (1)**
   71:25
**60 (12)**
   19:25;20:20;
   38:10,15;39:4;
   40:25;41:1;45:21;
   48:20;49:11,14;59:6
**65 (1)**
   10:6

---

**7**

**706.829.0289 (1)**
   5:15

---

**8**

**8 (3)**
   36:23,24,25
**8,000 (2)**
   55:21;56:3
**89 (2)**
   12:7,15
**8B (1)**
   4:2

---

**9**

**9 (1)**
   29:22
**91 (2)**
   12:18;13:21
**9-11-30e (1)**

---

82:23
**93 (4)**
   13:25;23:13;29:8;
   44:15
**94 (4)**
   29:20;33:19;46:3,
   3
**99 (2)**
   33:22;36:19

---